**FILED**

JUN 3 0 2011

Clerk, U S District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Mona K. Floyd, Esq.                         )
P.O. Box 907 Blvd.,                         )
Alexandria, Virginia 22313                  )
(703)728-8344                               )
                                            )
                  Plaintiff,                )
                                            ) COMPLAINT FOR DAMAGES
        vs.                                 )
                                            )
Office of Representative Sheila Jackson Lee ) CIVIL ACTION NO.
2160 Rayburn Office Building                 )
Washington, D.C. 20515

                                    Case: 1:11-cv-01228
                                    Assigned To : Wilkins, Robert L.
                  Defendant.        Assign. Date : 6/30/2011
                                    Description: Employ. Discrim.    **JURY**
_____            **ACTION**

<u>**COMPLAINT**</u>

Mona K. Floyd, plaintiff herein, on behalf of herself, for her

complaint herein, alleges as follows:

<u>**INTRODUCTION**</u>

This is a legal claim for unlawful discrimination  and

retaliation in violation of the Congressional Accountability Act, 2

U.S.C. § 1301 et seq. Ms. Floyd suffers from the disability of

monocular vision, which causes eye fatigue and strain, headaches,

reduced speed in reading, reduced concentration and comprehension, and

general physical fatigue. Specifically, Ms. Floyd's reading speed is

at least 20 to 30 percent slower than the average person and, if she

cannot adequately rest her eyes throughout the day, her reading pace

slows even further and her ability to concentrate and comprehend

written materials also decreases. Despite a lifetime of suffering from

this disability, Ms. Floyd has achieved academic and professional

**RECEIVED**          1

JUN 2 7 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia



RECEIVED
Mail Room

JUN 2 7 2011

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

success. Ms. Floyd holds a Juris Doctorate, a Master of Arts in Public Policy/Philosophy and Social Policy, and a Bachelor of Art in Philosophy, and was the recipient of multiple academic scholarships and awards while in school. Ms. Floyd was able to be successful despite her disability because she worked extremely hard throughout her education and also received reasonable accommodations.

Ms. Floyd has also achieved professional success despite the limitations of her disability, again because with reasonable accommodations, she is able to perform excellent work. In 2006, Ms. Floyd was chosen as a Congressional Black Caucus Foundation Fellow and assigned to the Office of Representative Jackson Lee. The Congressional Black Caucus Foundation informed the Office in a memorandum that she had a vision disability that would require reasonable accommodations, including specialized software. After a period of time in that position, Ms. Floyd and her managers determined that the specialized software was not an effective accommodation and chose instead to accommodate her disability by providing her with rest breaks and additional time to perform tasks. With these accommodations Ms. Floyd was very successful in the Office and, because of her excellent work as a Fellow, Representative Jackson Lee hired Ms. Floyd on permanently as her Director of Health Policy and Senior Legislative Assistant.  Ms. Floyd also personally informed the Representative of her vision disability when she was Director of Health Policy. In addition, in 2007, Ms. Floyd drafted legislation that addressed deficiencies in the educational system for persons with vision

2

disabilities and during that process explained to the Representative that she was particularly committed to the cause because of her vision disability. In December 2007, however, Research!America, a health policy advocacy non-profit, offered Ms. Floyd a position as Senior Director, which Ms. Floyd accepted because of the position's higher level of responsibility and compensation.

After two years with Research!America, Ms. Floyd again became interested in working in a legislative environment. In February 2010, then-Chief of Staff for Representative Jackson Lee, Leon Buck, recruited Ms. Floyd for the position of Legislative Director/Chief Counsel. During her discussions with Mr. Buck about the position, Ms. Floyd informed him that she had a vision disability and would only accept the position if the Office reasonably accommodated that disability in a manner similar to that during her prior employment in the Office. Mr. Buck assured her that the Office would accommodate her disability and specifically told her that he was planning on hiring additional staff to ensure that Ms. Floyd had a reasonable workload that would allow her to take the necessary rest breaks and to have additional time to perform reading related tasks. With this assurance, Ms. Floyd accepted the position and began on February 23, 2010. Despite Mr. Buck's assurances, however, almost immediately, Representative Jackson Lee began assigning Ms. Floyd numerous reading-related tasks that she demanded that Ms. Floyd personally perform. Because of volume of the Representative's demands, Ms. Floyd had

to work from 7:00 a.m. to 11:00 p.m. on a regular basis without any rest breaks. Maintaining this level of work without breaks was physically impossible for Ms. Floyd given her disability.

The working conditions further exacerbated the challenges presented by Ms. Floyd's vision disability when Mr. Buck left his position in early April, 2010.  The Office was not only left with no additional legislative staff as Mr. Buck Had assured Ms. Floyd, but was also left without a Chief of Staff for nearly two months.  By April 26, 2010, Ms. Floyd determined that she could no longer successfully work under conditions that did not accommodate her disability because doing so was taking an extremely high physical toll on her. That morning, Representative Jackson Lee called Ms. Floyd and assigned her numerous reading-related tasks, stating that Ms. Floyd needed to perform these tasks personally and adding sarcastically that "it should not take 10 years to get them done." The Representative regularly made these types of derogatory comments about the speed of Ms. Floyd's work, which the Representative knew was a result of her vision impairment. Ms. Floyd reminded Representative Jackson Lee of her vision disability and explained that because of her disability she needed time to rest her eyes, as well as additional time to perform tasks that involved reading. She asked the Representative if she could assign part of the tasks to another staff member, which would allow her to have time to take rest breaks while also complying with the Representative's timing needs.

4

Instead of engaging in a discussion to determine if Ms. Floyd's suggestion would constitute a reasonable accommodation or, if it did not, to discuss other possible options, Representative Jackson Lee responded: "I don't care anything about your disability." Representative Jackson Lee further stated that Ms. Floyd knew what she was getting herself into when she returned to the Office and that Ms. Floyd had better get the work done herself. Ms. Floyd was shocked by the Representative's comment for several reasons. First, the Representative had recently given her public support for the disabled community at a Judiciary Committee hearing on the issue of whether the Americans with Disabilities Act ("ADA") was adhered to for the purposes of providing disabled individuals access to information and services resulting from new technologies. Representative Jackson Lee's dismissive response to her staff member's own disability proved that the Representative was not a true advocate for persons with disabilities, but instead only paid lip service to that constituency. Second, the Representative's assertion that Ms. Floyd "knew what she was getting herself into" by returning to the Office ignored the agreement that she and Mr. Buck had made before she took the job and ignored the fact that during Ms. Floyd's prior employment she had received the very accommodation that she had just requested. Later that day, in an attempt to create a working environment in which she could function despite her disability, Ms. Floyd emailed Representative Jackson Lee with concrete suggestions about how to effectively structure the legislative team to further the

5

Representative's agenda. Ms. Floyd did not again reference her disability and the need for reasonable accommodation in the email, since Representative Jackson Lee had made clear in their earlier conversation that she did not care about Ms. Floyd's disability and would not discuss that topic. However, the changes Ms. Floyd recommended in the April 26, 2010, email would have allowed her the necessary time to take needed rest breaks and additional time to perform reading-related tasks. Representative Jackson Lee never responded to her email.

Given Representative Jackson Lee's refusal to engage in the required interactive process to determine if any reasonable accommodations could be provided for her disability, in June 2010, soon after the new Chief of Staff, Nathaniel Thomas, started, Ms. Floyd notified him of her disability and attempted to engage him in a discussion regarding reasonable accommodations. Mr. Thomas assured Ms. Floyd that he understood the situation and would discuss the matter with Representative Jackson Lee. Ms. Floyd followed up with Mr. Thomas about her request for a reasonable accommodation at least twice between June and August. Finally, on August 6, 2010, Mr. Thomas informed Ms. Floyd that he had spoken with Representative Jackson Lee about potential reasonable accommodations, but that the Representative's only response was: "I don't give a damn about her disability." Because of the Representative's hostile response, Mr. Thomas did not suggest or enact any reasonable accommodations.

By September 2010, the Office's refusal to discuss or implement any accommodations had created working conditions that were so emotionally and physically grueling that Ms. Floyd had no option but to resign. On September 7, 2010, Ms. Floyd notified Representative Jackson Lee's current Chief of Staff, Yohannes Tsehai, that the Office had violated the ADA and that in doing so had created such intolerable working conditions for her that she was constructively discharged. She stated that her final day at work would be September 17, 2010.

### LEGAL FRAMEWORK

By refusing to engage in the interactive process to determine if any reasonable accommodation existed that would allow Ms. Floyd to perform the essential functions of the job and by constructively discharging her, the Office of Representative Sheila Jackson Lee violated the Congressional Accountability Act ("CAA"), 2 U.S.C. § 1301 et seq. As applied to congressional employees under the CAA, the ADA prohibits an employer from discriminating against a qualified individual with a disability because of that disability. See CAA, 2 U.S.C. §131 1(a)(3); ADA, 42 U.S.C. § 12101 et seq. In this context, the term discriminate includes "not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability. . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operations of the business.. . ." 42 U.S.C. §121 12(b)(5)(A) & (B); Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir.

7

Case 1:11-cv-01228-RLW   Document 1   Filed 06/30/11   Page 8 of 11

2008) (employer has a duty to accommodate a known disability). As part of this duty to reasonably accommodate, the ADA requires both parties to engage in an interactive process to identify the precise limitations resulting from the disability and the potential reasonable accommodations. See Pantazes v. Jackson, 366 F. Supp. 2d 57, 70 (D.D.C. 2005) (citing 29 C.F.R. § 1630.2(o)(3)); see also Brady, 531 F.3d at 136 (employer is obligated to engage in interactive process to identify reasonable accommodation); Beck v. University of Wis. Rd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996). The interactive process begins when an employee requests an accommodation. Once this process has begun, both the employer and the employee have a duty to act in good faith, and the absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation. See Pantazes, 366 F. Supp. 2d at 70; see also Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002) (quoting Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 165 (3d Cir. 1999)).

It cannot be disputed that Ms. Floyd is disabled and that the Office was aware of that disability. Because Ms. Floyd's monocular vision substantially limits her reading, concentrating, and thinking — three categories of major life activities specifically listed by the ADA — it qualifies as a disability. See 42 U.S.C. § 12102(3)(1)(A); 29 C.F.R. § 1630.2.2. The Office was initially made aware of Ms. Floyd's disability on August 1, 2006, in a memorandum from the Congressional Black Caucus Foundation informing the Office that Ms. Floyd had a vision disability. Ms. Floyd also personally notified Representative

Sheila Jackson Lee of her vision disability in 2007 when she drafted the WONDER ACT (Ways to Open New Doors with Educational Resources), that was intended to provide educational resources to the visually impaired; and when she personally introduced her to family friend Stevie Wonder, a well known individual and musical legend who could champion the bill. Ms. Floyd drafted, the WONDER Act Ms. Floyd again notified the Office of her vision disability before she accepted her position as Legislative Director in February 2010. She again personally notified Representative Jackson Lee on April 26, 2010, of her vision disability. Finally, in the summer of 2010 she notified the then-Chief of Staff, Nathaniel Thomas, of her vision disability, who spoke to the Representative about Ms. Floyd's disability. There is no question that the Office was repeatedly put on notice of Ms. Floyd's disability.

Throughout her tenure in the Office, Ms. Floyd upheld her duty under the ADA by notifying the Office of her disability and repeatedly requesting reasonable accommodations. These requests were made to no avail.  Instead of engaging in a good-faith interactive process to assist Ms. Floyd in seeking accommodations, the Office refused to discuss any accommodation. This total failure to engage in an interactive process evidences a complete lack of good-faith effort. Furthermore, Representative Jackson Lee's statement to Ms. Floyd that she "didn't care anything about [her] disability" and her statement to Mr. Thomas that she "didn't give a damn about her disability" are further evidence of the Office's lack of good-faith. Finally, Ms.

9

Floyd could have been reasonably accommodated had the Office made a good-faith effort to seek accommodations. When Ms. Floyd had previously worked in the Office, she had received accommodations, including regular rest breaks, and had been so successful working with those accommodations that the Office recruited her for the Legislative Director position two years later. By failing to engage in any discussions about possible accommodations, the Office impeded the required interactive process and violated the ADA. Sec. 3 of the Act." 42 USC § 12102(4)(a).

Working without any reasonable accommodations for her disability caused Ms. Floyd severe physical and mental fatigue, headaches, and eye strain. Additionally, Ms. Floyd suffered mounting levels of emotional distress due to the Office's continued refusal to engage in discussions regarding reasonably accommodating her disability and Representative Jackson Lee's humiliating and dismissive statements about her disability. Continuing to work under such conditions was so intolerable that Ms. Floyd was compelled to resign in order to ensure that she did not suffer further physical and mental harm. Her resignation, therefore, constitutes a constructive discharge. See Pennsylvania State Police v. Suders, 542 U.S. 129, 146-47 (2004) (recognizing constructive discharge under Civil Rights statutes); see also Talley v. Family Dollar Stores of Ohio, 542 F.3d 1099 (6th Cir. 2008) (recognizing defendant's refusal to accommodate plaintiff could constitute constructive discharge under the ADA).

As a result of the Office's constructive discharge of Ms. Floyd and its failure to reasonably accommodate her and retaliation with dismissive and derogatory comments about the timing of her work due to her vision disability, Ms. Floyd has experienced significant emotional distress and economic damages. This constructive discharge has come at the worst possible time. Over the past nine months since her discharge, Ms. Floyd has attempted to secure a comparable position but despite her efforts, she has been unable to do so. She continues to face the difficult task of searching for a new position in the midst of a terrible job market.

### Prayer of Relief

Ms. Floyd seeks back and front pay, compensatory damages, punitive damages and attorneys' fees and costs. See 2 U.S.C. § 1311.

### DEMAND FOR JURY TRIAL

Mona K. Floyd demands a trial by jury on all issues so triable under claims in this action.

DATED: June 22, 2011

*Mona K. Floyd*

Mona K. Floyd, Esq.

.