**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **MONA K. FLOYD,** |
| **Plaintiff,** |
| **v.** |
| **OFFICE OF REPRESENTATIVE SHEILA JACKSON LEE,** |
| **Defendant.** |

**Civil Action 11-1228  (RC)**

**MEMORANDUM OPINION**

For approximately seven months in 2010, Mona Floyd was the legislative director and chief counsel in the office of Representative Sheila Jackson Lee.[1]  Ms. Floyd, who is proceeding *pro se*, now brings suit against that office under the Congressional Accountability Act, 2 U.S.C. § 1301 *et seq.*, alleging that the office of Rep. Jackson Lee discriminated against her by failing to reasonably accommodate her monocular vision, which had the effect of constructively discharging her.  She also alleges that she was subjected to a discriminatorily hostile work environment, and that she was retaliated against for requesting a reasonable accommodation. The office of Rep. Jackson Lee moves to dismiss the complaint, arguing that the Speech or Debate Clause of the United States Constitution both renders it immune from this suit and deprives Ms. Floyd of the ability to introduce the evidence necessary to prove her claims.  In the alternative, the office argues that Ms. Floyd has failed to state a claim on which relief can be granted.

---

[1]  Although the office and not the officeholder is the defendant in this suit, *see* 2 U.S.C. §§ 1301(9), 1408(b), the court will sometimes refer to "the Representative" or "Rep. Jackson Lee" as though she were personally defending the claims brought against her office.

# I. FACTUAL ALLEGATIONS

According to her amended complaint, Mona Floyd began to work in the office of Representative Sheila Jackson Lee in 2006, when she was a fellow with the Congressional Black Caucus Foundation. Am. Compl. at 3. Ms. Floyd suffers from monocular vision, which causes eye strain and eye fatigue, headaches, and bodily fatigue. *Id.* at 2. The condition also reduces the speed at which she can read, her concentration while reading and, consequently, her comprehension of what she has read. *Id.* The Congressional Black Caucus Foundation notified the office of Rep. Jackson Lee about Ms. Floyd's condition, and the office provided assistive software. *Id.* at 3. After a period of time, Ms. Floyd and the office determined that the software was not effective for her, and she was instead given rest breaks and additional time to perform assignments. *Id.* When Ms. Floyd completed her fellowship, Rep. Jackson Lee hired her as director of health policy and senior legislative assistant, and Ms. Floyd told the Representative about her monocular vision. *Id.* In late 2007, Ms. Floyd resigned from the office to pursue another professional opportunity. *Id.* at 3–4.

In February 2010, Rep. Jackson Lee's chief of staff recruited Ms. Floyd to be the Representative's legislative director and chief counsel. As they discussed the position, Ms. Floyd informed him of her impaired vision and said that she would only accept the job if the office would make accommodations similar to those it had made when Ms. Floyd worked there before. *Id.* at 4. Ms. Floyd also asked whether she and the other members of the Representative's Washington, D.C. staff would be responsible for preparing Rep. Jackson Lee for events in her district office, as had been the case when Ms. Floyd first worked for the Representative. Ms. Floyd expressed her concern that she might not be able to perform such duties in addition to the increased legislative responsibilities attendant upon the new position. *Id.* The chief of staff

assured Ms. Floyd that the office would accommodate her monocular vision.  *Id.*  He said that the office was planning to hire additional staff to ensure that Ms. Floyd would have a reasonable workload, one which allowed her to take rest breaks and have additional time to perform reading-related assignments.  *Id.* at 4–5. With these assurances, Ms. Floyd accepted the position.  *Id.* at 5.

As Ms. Floyd recounts, shortly after she rejoined the office of Rep. Jackson Lee, the Representative began to assign tasks involving reading that Ms. Floyd was to personally perform. *Id.*  Among other assignments, Ms. Floyd was asked to prepare speeches for the Representative to deliver in her district; to prepare press releases and materials for interviews; to write letters to, and arrange and attend meetings with, federal and state government officials; to prepare statements for staff members to deliver on the Representative's behalf; and to write a letter of recommendation for a constituent.  *Id.*  Once, Rep. Jackson Lee required Ms. Floyd to wait in the office until 2 a.m., so that she could drive the Representative home; at her front door, the Representative asked Ms. Floyd to prepare a statement for an early morning event with journalists and other newspaper employees.  *Id.* at 6.

The volume of the Representative's assignments often forced Ms. Floyd to work from seven in the morning until eleven at night without a break for rest.  Ms. Floyd was physically unable to maintain this pace of work.  *Id.*  By late April, when the office was without a chief of staff, Ms. Floyd had concluded that her monocular vision would not allow her to continue working in this way.  *Id.* at 7.  On the morning of April 26, Rep. Jackson Lee assigned Ms. Floyd a number of tasks that required reading, including several for events in the Representative's district.  *Id.*  The Representative made clear that Ms. Floyd needed to perform the tasks herself, and, as Ms. Floyd recalls, added that "it should not take ten years to get them done."  *Id.*  The Representative often made similar comments—which Ms. Floyd describes as "humiliating" and

3

"derogatory," *id.* at 10—about her monocular vision and the pace at which she worked, which the

Representative knew was a result of her limited vision. *Id.* at 7. Ms. Floyd reminded Rep.

Jackson Lee about her monocular vision and explained that she needed time to rest her eyes, as

well as additional time to perform assignments that required reading. *Id.* She asked the

Representative if she could delegate the preparation of a speech and other materials for an

education forum to the staff member who handled education issues, so that Ms. Floyd would be

able to rest her eyes without delaying the work of the office. *Id.* at 8. She also asked the office

(whether that day or earlier in her conversations with the chief of staff is not clear from the

amended complaint) to either relieve her of or allow her to delegate the preparation of speeches,

press releases and other statements that would be used or delivered in the Representative's

district. *Id.* Ms. Floyd alleges that Rep. Jackson Lee responded, "I don't care anything about

your disability." *Id.* On Ms. Floyd's account, Rep. Jackson Lee went on to say that Ms. Floyd

knew what she was getting herself into when she returned to the office, and that she had better

get the work done herself. *Id.* Later that day, Ms. Floyd wrote an email to Rep. Jackson Lee,

recommending ways in which the Representative could restructure her legislative team. *Id.* at 9.

Although Ms. Floyd did not refer to her monocular vision in the email, those changes would have

provided her with additional time to take rest breaks and complete tasks that required reading.

*Id.* Rep. Jackson Lee did not respond. *Id.*

In June, shortly after the Representative hired a new chief of staff, Ms. Floyd informed

him of her monocular vision and attempted to engage him in a conversation about how that

condition could be accommodated. *Id.* at 10. The new chief of staff assured Ms. Floyd that he

would discuss the matter with Rep. Jackson Lee. *Id.* Ms. Floyd revisited the matter with the new

chief of staff at least twice, and mentioned the Representative's frequent comments about her

disability and pace of work to him. *Id.*  On August 6, 2010, as Ms. Floyd alleges, the new chief of

staff told Ms. Floyd that he had spoken to Rep. Jackson Lee, but that the Representative only

responded "I don't give a damn about her disability." *Id.*  Ms. Floyd told him that the office's

response to her requests violated the Americans with Disabilities Act, and that she was

considering filing a claim. *Id.*  The chief of staff agreed and referred her to two employment

lawyers. *Id.*

Ms. Floyd resigned from the position the following month, shortly after informing Rep.

Jackson Lee's new chief of staff (the third that year) that she could no longer tolerate the working

conditions, and that she believed that the office had violated the Americans with Disabilities Act,

and in doing so had constructively discharged her. *Id.* at 10.  After completing the statutorily

required counseling and mediation, Ms. Floyd filed this suit under the Congressional

Accountability Act.  The defendant has moved to dismiss the complaint.

## II.  STATUTORY AND CONSTITUTIONAL BACKGROUND

### A.  The Congressional Accountability and Americans with Disabilities Acts

The Congressional Accountability Act makes the employment discrimination provisions

of the Americans with Disabilities Act applicable to congressional offices.  *Oscarson v. Off. of

Senate Sergeant at Arms*, 550 F.3d 1, 2 (D.C. Cir. 2008) (citing 2 U.S.C. § 1311(a)(3)).[2]   The

ADA, in turn, bars discrimination against "a qualified individual on the basis of disability in

regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions,

---

[2]  The Accountability Act also makes it "unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by this chapter, or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding under this chapter."   2 U.S.C. § 1317 (a).

and privileges of employment." 42 U.S.C. § 12112(a).[3] Claims of discrimination under the

ADA can take one of four forms: intentional discrimination (or "disparate treatment"), *e.g.*,

*Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929 (D.C. Cir. 1999), disparate impact,

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003),  hostile work environment,[4] and failure to

accommodate, *e.g.*, *Aka v. Wash. Hosp. Ctr.* 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).

    When a plaintiff alleges intentional discrimination on the basis of disability, the

defendant will usually assert that it acted "for reasons unrelated to the person's handicap."  *Barth*

*v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (discussing the Rehabilitation Act).  Such "disparate

treatment disability discrimination claim[s]" are analyzed "under the familiar three-part protocol

set forth by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 [(1973)]."

*Aka*, 156 F.3d at 1288; *see also Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999)

("*Aka* adopted for ADA claims *Barth*'s thorough analysis of the applicability of *McDonnell*

*Douglas* to such claims in the Rehabilitation Act context.").  The *McDonnell Douglas* test, in

turn, focuses on the motives for an employer's action.  Its first two steps, which shift the burden

of production before a plaintiff must ultimately prove her case, are "designed to 'sharpen the

inquiry' into an 'elusive' fact—an employer's discriminatory motivation." *Barth*, 2 F.3d at 1185

(quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981)).  As the D.C.

---

    [3] A "qualified individual" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

    [4] Although this circuit has not resolved the question, four circuits have found that hostile work environment claims are available under the ADA, *see Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1155 (10th Cir. 2004); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 232–35 (5th Cir. 2001); *Fox v. Gen'l Motors Corp.*, 247 F.3d 169, 175–77 (4th Cir. 2001).

Circuit has explained, *McDonnell-Douglas*'s "requirement of only a minimal prima facie showing strips the defendant of the ability to remain silent as to its motive while recognizing the plaintiff's ultimate obligation to prove that motive's illegality." *Id.* at 1186; *see also id.* (explaining that "the *Burdine* three-step approach was designed to address" the need for an "inquiry into subjective facts" such as "the employing agency's true motivation").

When a disabled plaintiff alleges a failure to make a reasonable accommodation, however, she need not explain why her employer has failed to accommodate her. The failure to accommodate is itself discriminatory. The ADA "defines the term 'discriminate' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business. . . .'" *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 n.3 (D.C. Cir. 2002) (quoting 42 U.S.C. § 12112(b)(5)(A)). "Under the ADA's scheme, then, it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question 'would impose an undue hardship on the operation of the business' of the employer." *Aka*, 156 F.3d at 1300. "To make out a prima facie case of discrimination for failure to reasonably accommodate [under the ADA], [the] plaintiff must demonstrate by a preponderance of the evidence: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of her job; and (4) that the employer refused to make such accommodations." *Etheridge v. FedChoice Federal Credit Union*, 789 F. Supp. 2d 27, 35 (D.D.C. 2011). The employer's motivation for refusing the accommodation plays no part in that analysis, and therefore reasonable-accommodation claims are "not subject to

analysis under *McDonnell-Douglas*." *Aka*, 156 F.3d at 1288.

### B.  The Speech or Debate Clause

"Article I, section 6 of the Constitution provides that 'for any speech or debate in either

House, [Senators and Representatives] shall not be questioned in any other place.'" *Fields v.*

*Office of Eddie Bernice Johnson*, 459 F.3d 1, 4 (D.C. Cir. 2006) (en banc) (plurality opinion)

(alteration in original).  The D.C. Circuit has recently described the scope of this Speech or

Debate Clause as follows:

> In furtherance of separation of powers, the Framers sought to "provide some practical security for each [branch of government], against the invasion of the others." THE FEDERALIST No. 48 (James Madison).  The Speech or Debate Clause serves "to insure that the legislative function the Constitution allocates to Congress may be performed independently" without subjecting the legislature to "accountability before a possibly hostile judiciary." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975).  The Supreme Court has, "[w]ithout exception . . . read the Speech or Debate Clause broadly." *Id.* at 501.  Indeed, the Court has held that the protections of the Clause apply "not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel v. United States*, 408 U.S. 606, 618 (1972).

> The Clause protects legislators from liability for all activities within the "sphere of legitimate legislative activity," *Eastland*, 421 U.S. at 503, including all activities that are

>> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel*, 408 U.S. at 625.  "Legislative activity" is broadly construed, encompassing not only anything "generally done in a session of the House by one of its members in relation to the business before it," *id.* at 624 (quotations and citation omitted), but also "conduct at committee hearings, preparation of committee reports, authorization of committee publications and their internal distribution, and issuance of subpoenas concerning a subject on which legislation could be had." *McSurely v. McClellan*, 553 F.2d 1277, 1284–85 (D.C. Cir. 1976) (quotations and citations omitted); *see also, e.g.*, *id.* at 1296–97 ("[T]he subsequent use of . . . documents by the committee staff in the course of official business is privileged legislative activity.").  The Clause

also protects staff members' preparations for legislative activities. *See, e.g.*, *Gravel*, 408 U.S. at 628–29.

*Howard v. Office of Chief Admin. Officer*, 720 F.3d 939, 945–46 (D.C. Cir. 2013).  Although the Supreme Court's understanding of "legislative activity" is broad, it does not "include all things in any way related to the legislative process." *United States v. Brewster*, 408 U.S. 501, 516 (1972). As that Court has explained:

> It is well known . . . that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress.  The range of these related activities has grown over the years.  They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases.  But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause.

*Id.* at 512; *see also Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979) ("[T]ransmittal of . . . information by press releases and newsletters is not protected by the Speech or Debate Clause."); *Fields*, 459 F.3d at 12 (plurality opinion) ("The Speech or Debate Clause protects conduct that is integral to the legislative *process*, not a Member's legislative *goals*.  It may be integral to a Member's legislative goals—indeed, integral even to accomplishing his constitutionally delegated duties—to send newsletters to constituents or deliver speeches outside of Congress to generate support for prospective legislation.  But such acts are "political," not "legislative," and therefore not protected by the Speech or Debate Clause.") (footnotes, internal quotation marks, and citations deleted)).  As the Tenth Circuit has summarized it, the "'broad' constructions of the Speech or Debate Clause have always been confined within the limits of formal, official

proceedings. . . .   The expression summarizing this proposition is that the Clause protects only 'legislative,' not 'political,' acts."  *Bastien v. Office of Sen. Ben Nighthorse Campbell*, 390 F.3d 1301, 1315 (10th Cir. 2004).

> The Speech or Debate Clause "affords three distinct protections" in a civil suit:
>
> (a) an immunity from "a . . . judgment against a Member because [of] conduct [that] is within the sphere of legitimate legislative activity," *Doe v. McMillan*, 412 U.S. 306, 312 (1973) (quotations and citation omitted); (b) an evidentiary privilege, which, in relevant part, bars a party in a civil suit from "[r]evealing information as to a legislative act" for use against a protected party, *United States v. Helstoski*, 442 U.S. 477, 490 (1979); and (c) a testimonial and non-disclosure privilege that prevents a protected party from being compelled to answer questions about legislative activity or produce legislative materials, *see, e.g.*, *United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 659–60 (D.C. Cir. 2007).

*Howard*, 720 F.3d at 946.

### C.  The Speech or Debate Clause and the Congressional Accountability Act

The Clause has significant implications for suits under the Congressional Accountability Act, but the exact nature of those implications is a matter of some uncertainty in this circuit. When the court of appeals considered the question en banc, it produced four opinions with "no clear majority."  *Id.* (discussing *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1 (D.C. Cir. 2006) (en banc)).  A plurality opinion joined by half of the court stated "that 'a Member's personal office may be liable under the [Congressional Accountability Act] for misconduct provided that the plaintiff can prove his case without inquiring into legislative acts or the motivation for legislative acts.'" *Id.* at 946–47 (quoting *Fields*, 459 F.3d at 17).  A fifth judge concurred in part, but believed "that the court should have left 'open the question of how the Clause may limit evidence offered by parties in [Accountability Act] litigation and whether the role of the Member's personal office as the defendant under the [Congressional Accountability Act] affects the application of the Clause.'" *Id.* at 947 (quoting *Fields*, 459 F.3d at 18 (Rogers, J.,

10

concurring in part and in the judgment)); *see also Howard v. Office of Chief Admin. Officer*, 840 F. Supp. 2d 52, 56–57 (D.D.C. 2012) (discussing the fractured opinions in *Fields*).  Because the *Fields* plurality opinion "reflects the broadest view of the Speech or Debate Clause" as applied to the facts of this case, the court will employ its framework, as both a panel of the D.C. Circuit and a judge in this district have done.  *Howard*, 720 F.3d at 947; *Scott v. Office of Rodney Alexander*, 522 F. Supp. 2d 262, 267–72 (D.D.C. 2007).

In the context of employment suits under the Congressional Accountability Act, the *Fields* plurality wrote, the Speech or Debate Clause can operate in one of two ways.  First, "[t]he Speech or Debate Clause operates as a jurisdictional bar when 'the actions upon which [a plaintiff] sought to predicate liability were "legislative acts."'"  *Fields*, 459 F.3d at 13 (quoting *Doe v. McMillan*, 412 U.S. 306, 318 (1973) (quoting *Gravel*, 408 U.S. at 618))) (second alteration in original).  "Political" acts, *id.* at 12 (quoting *Brewster*, 408 U.S. at 512), such as "send[ing] newsletters to constituents or deliver[ing] speeches outside of Congress to generate support for prospective legislation," *id.*, or those that merely have "some nexus to legislative functions," *Brewster*, 408 U.S. at 528, can, however, give rise to liability under the Congressional Accountability Act.  Second, even when the Speech or Debate Clause does not act as a jurisdictional bar, "it still 'protect[s] Members from inquiry into legislative acts or the motivation for actual performance of legislative acts.'"  *Fields*, 459 F.3d at 14 (quoting *Brewster*, 408 U.S. at 508).  "In 'many cases,' the *Fields* plurality opinion notes, it may be impossible to explore the reasons for the challenged employment action without discussing legislative acts and this may lead to the dismissal of . . . claims" brought under the Congressional Accountability Act.  *Howard*, 720 F.3d at 947 (quoting *Fields*, 459 F.3d at 15–16).

The *Fields* plurality suggested a procedure to be used when a Member's office believes

that a plaintiff's claim would necessarily require inquiry into legislative acts or the motivation for

such acts.

> To invoke the Speech or Debate Clause, the employing office should include . . . an affidavit from an individual eligible to invoke the Speech or Debate Clause recounting facts sufficient to show that the challenged personnel decision was taken because of the plaintiff's performance of conduct protected by the Speech or Debate Clause. The affiant must have personal knowledge of the facts underlying his averment and otherwise must be able to assert a Member's Speech or Debate Clause immunity. See *Gravel*, 408 U.S. at 618; *see also id.* at 622 n.13 ("[A]n aide's claim of privilege can be repudiated and thus waived by the Senator."). The affidavit must indicate into what "legislative activity" or into what matter integral to the due functioning of the legislative process the plaintiff's suit necessarily will inquire.

> With that submission, the district court must then determine whether the asserted activity is in fact protected by the Speech or Debate Clause. If it is, the action most likely must be dismissed . . . . If the lawsuit does not inquire into legislative motives or question conduct part of or integral to the legislative process, or if the district court determines that the asserted activity is not in fact part of or integral to the legislative process, then the case can go forward. . . . [A] plaintiff who seeks to prevail by quarreling with the defendant's statements about activity protected by the Speech or Debate Clause must fail.

*Fields*, 459 F.3d at 16–17 (footnote deleted).  As the *Fields* plurality noted, the *McDonnell-*

*Douglas* burden-shifting framework "presents special problems in the context of the Speech or

Debate Clause" because "[l]iability for discriminatory personnel decisions rests on . . . the reason

that action was taken," but the Speech or Debate Clause prevents inquiry into a Member's

motivation for legislative acts.  *Fields*, 459 F.3d at 15.

## III.  LEGAL STANDARD

### A.  Subject Matter Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a

complaint, or a claim therein, for lack of subject-matter jurisdiction.  FED. R. CIV. P. 12(b)(1);

*see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are

courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited

jurisdiction . . . .").  In response to such a motion, the plaintiff must show that her claims lie within "the judicial Power of the United States," U.S. CONST. art. III, § 1, and that a federal statute grants the Court jurisdiction to hear those claims.  *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010) (citing *Mayor v. Cooper*, 73 U.S. 247, 252 (1868)); *see also Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008).  If the plaintiff cannot establish both elements, the Court must dismiss the action.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 7 U.S. 506, 514 (1868)).  An immunity conferred by the Constitution may also act as a jurisdictional bar.  *Fields*, 459 F.3d at 13.

When resolving a motion made under Rule 12(b)(1), the Court will "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

### B.  Cause of Action

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The motion does not test a plaintiff's ultimate likelihood of success on the merits, but only forces the court to determine whether a plaintiff has properly stated a claim.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  The complaint must set forth a short and plain statement of the claim, in order to give the defendants fair notice of the claim and the grounds upon which it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  The Speech or Debate Clause can prevent a plaintiff from stating a claim.  *Ray v. Proxmire*, 581 F.2d 998, 1000 (D.C. Cir. 1978)

(per curiam) (affirming dismissal for failure to state a claim where that claim "cannot survive the Speech or Debate Clause").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

The court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Browning*, 292 F.3d at 242. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## IV.  ANALYSIS

Ms. Floyd alleges that the office of Rep. Jackson Lee violated the Congressional Accountability Act by failing to reasonably accommodate her monocular vision, which had the effect of constructively discharging her. She also alleges that she was subjected to a discriminatorily hostile work environment, and that she was retaliated against for requesting a reasonable accommodation. The Representative first argues that this suit must be dismissed because it would predicate liability on legislative acts and would necessarily "inquire into legislative motives or question conduct part of or integral to the legislative process." *Fields*, 459

F.3d at 16.  As suggested by the *Fields* plurality, Rep. Jackson Lee has submitted an affidavit identifying the legislative acts into which she believes that the suit would necessarily inquire.  In the alternative, the Representative argues that the amended complaint does not state a claim on which relief can be granted.

### A.  Speech or Debate Clause

#### i.  Immunity

Ms. Floyd's claims are predicated on Rep. Jackson Lee's alleged refusal to accommodate her monocular vision by allowing her to have rest breaks and additional time to perform reading-related assignments, and also on the Representative's allegedly "humiliating" and "derogatory" comments about Ms. Floyd's disability and the pace of her work.  Am. Compl. at 10.  Neither the denial of the accommodation nor the alleged comments are legislative acts protected by the Speech or Debate Clause.

Rep. Jackson Lee's argument to the contrary is somewhat difficult to parse, as it relies almost entirely upon cases in which the Speech or Debate clause acts in its capacity as an evidentiary or non-disclosure privilege, rather than cases in which it provides a blanket immunity.  *E.g.* Def.'s Mot. at 21 (arguing that Rep. Jackson Lee is immune from this suit because "inquiry into legislative acts or motivation for legislative acts is necessary" for Ms. Floyd "to make out a prima facie case" (quoting *Brewster*, 408 U.S. at 525)).  Rep. Jackson Lee focuses on the email in which Ms. Floyd suggested that the Representative could restructure her legislative team and thereby provide Ms. Floyd with additional time to take rest breaks and complete tasks that required reading.  Am. Compl. at 9.  The Representative argues that all decisions regarding the structure of her legislative staff are themselves legislative acts, as are any decisions about the delegation of work—even concededly "political" work such as the

preparation of speeches to be given outside of Congress—to particular aides.  Because (the

Representative says) all of Ms. Floyd's claims center on the structure of her staff and her

assignments to that staff, they are barred by Rep. Jackson Lee's Speech or Debate Clause

immunity.

There are two separate problems with this argument.  First, it misunderstands the basis of

Ms. Floyd's claims.  Ms. Floyd has two chief complaints: that Rep. Jackson Lee would not allow

her either rest breaks or time to perform reading-related tasks at a physically manageable pace,

and that the Representative embarrassed and humiliated her because of her vision condition, or

her request for an accommodation of that condition, or both.  Ms. Floyd did suggest that her first

complaint could be addressed either by allowing her to delegate work to other staff members or

by restructuring the Representative's legislative team, but those suggestions were simply ways of

meeting her fundamental demands, which were rest and time.  Decisions about whether to allow

an employee to rest or to have additional time to complete assignments are not, assessed at that

level of generality, legislative acts for which the Representative enjoys constitutional immunity

from suit.

And even if the Representative's description of Ms. Floyd's claims was accurate—even if

Ms. Floyd really was complaining about the structuring of the legislative staff or the distribution

of assignments among the staff members—such decisions are not necessarily covered by the

Speech or Debate Clause, because not everything that the legislative staff does is "legislative

activity" within the meaning of the Speech or Debate Clause cases.

The D.C. Circuit once held that if an "employee's duties are an integral part of the

legislative process, such that they are directly assisting members of Congress in the 'discharge of

their functions,' personnel decisions affecting them are correspondingly legislative and shielded

from judicial scrutiny." *Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923, 929

(D.C. Cir. 1986).  Under *Browning*, "the standard for determining Speech or Debate Clause

immunity" with regard to a personnel decision was "whether the employee's duties were directly

related to the due functioning of the legislative process." *Id.*  If that were still the law in this

circuit, Rep. Jackson Lee would be immune from this suit for just the reasons that she suggests:

there is little question that Ms. Floyd's duties were "directly related to the due functioning of the

legislative process."  But *Browning* was unanimously repudiated by the en banc court in *Fields*.

The *Fields* plurality expressed the view that "an employee's duties are too crude a proxy for

protected activity," explaining that "a legislative aide may be discharged because of budgetary

cutbacks; a staff member may be demoted solely for tardiness; a person seeking a top-level staff

position might be rejected for having a poor college transcript; and so forth.  That the person

targeted by the personnel decision performs duties 'directly related to . . . the legislative process'

is not enough—conduct must be 'part of,' not merely 'related to,' the 'due functioning' of the

'legislative process' to be protected by the Speech or Debate Clause." *Fields*, 459 F.3d at 11–12.

The principle concurrence agreed that the holding of *Browning* "lacks any basis in the Speech or

Debate Clause," explaining that "even if a complaining employee's duties are central to the

legislative process, as in the case of an employee who drafts legislation and floor speeches, the

employee's lawsuit may turn factually on a series of overt requests for sexual favors and crude

remarks, and therefore it may have nothing to do with the member's legislative activities." *Id.* at

25, 26 (Brown, J., concurring in the judgment); *see also id.* at 17 (Rogers, J., concurring in part

and in the judgment) ("I agree that the employee-duties test of *Browning* . . . is overbroad and

must be rejected.").

 After *Fields*, some decisions about the structure of a Representative's legislative staff can

clearly form the basis of a civil suit: if, for example, Rep. Jackson Lee decided that she preferred female staffers and so fired the men on her staff because of their sex, she would not be immune from a suit brought by the fired employees.  By the same token, suits that "turn factually on a series of . . . crude remarks" to a staff member, such as Ms. Floyd's hostile work environment claim here, likely "have nothing to do with the member's legislative activities."  *Id.* at 26 (Brown, J., concurring in the judgment).  And even some suits that turn on the substance of a legislative aide's work are not barred by the Speech or Debate Clause, because not all of a legislative aide's duties are protected legislative activity.  Duties that "are 'political,' not 'legislative'" can form the basis for a suit, notwithstanding the Speech or Debate Clause. *Fields*, 459 F.3d at 12 (plurality opinion).  So it is not the case that, as the Representative argues, "a Member's conduct concerning the duties of . . . legislative aides, employing additional legislative aides, or structuring the legislative team" necessarily implicate the Speech or Debate Clause. Def.'s Mot. at 23–24.  Decisions regarding the structuring of the legislative staff that do not "turn factually on" protected legislative acts are not themselves protected; nor are decisions to assign non-legislative work to legislative aides.  To hold otherwise would revive the rejected rule of *Browning*.  But even though Senators and Representatives do not enjoy a blanket immunity from all suits predicated on decisions regarding the structure of their legislative staffs, such suits are nonetheless barred if proving the particular facts alleged would require "inquiry into legislative acts or the motivation for actual performance of legislative acts.'"  *Fields*, 459 F.3d at 14 (quoting *Brewster*, 408 U.S. at 508).  The court therefore turns to Rep. Jackson Lee's argument that this is so.

### ii.  Evidentiary and Non-Disclosure Privileges

Rep. Jackson argues that even if Ms. Floyd's claims do not predicate liability on

legislative acts, they could not be proven without inquiry into such acts or the motives for those acts.  To prevail on her failure to accommodate claim, Ms. Floyd must specify the accommodation that she sought, and prove by a preponderance of the evidence that it was reasonable.  *Flemmings*, 198 F.3d at 861.[5]  As discussed above, Mr. Floyd requested time to rest her eyes and to complete reading-intensive tasks at a physically manageable pace.  She suggested that this request could be accommodated by relieving her of some of her non-legislative duties, such as preparing materials for Rep. Jackson Lee's media appearances and political events in her district.  The Representative argues that she had a "legislative need for Plaintiff to balance (not delegate) the work involved in completing Plaintiff's essential non-legislative/political duties," Def.'s Mot. at 28, "because the assignment of political tasks to Plaintiff was integral to the way the Member exercised her legislative function," *id.* at 17 n.59.  Although the Court does not doubt that "[b]ecause of the political demands associated with Congressional offices, legislative aides must . . . perform essential non-legislative/political functions quickly and skillfully," *id.* at 18, the reality of those political demands does not somehow transmute political duties into legislative ones.

The Representative's next argument is that Ms. Floyd might raise certain arguments that (Rep. Jackson Lee says) the Speech or Debate Clause places off limits, by disputing (for instance) the importance of certain legislative assignments, or the need for Ms. Floyd to personally perform them.  But Ms. Floyd's has carefully (perhaps too carefully) crafted her complaint to avoid precisely this argument and to center only on the assignment and delegation

---

[5] The office of Rep. Lee could then invoke "the affirmative defense of undue hardship," in which case it would "bear[] the burden of establishing hardship based on several factors, including the nature and cost of the proposed accommodation, and the resources and circumstances of the employer." *Flemmings*, 198 F.3d at 861.

of political tasks.  The Speech or Debate Clause would prohibit Ms. Floyd from compelling Rep. Jackson Lee "to answer questions about legislative activity or produce legislative materials" at a deposition, *Howard*, 720 F.3d at 946 (citing *United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 659–60 (D.C. Cir. 2007)), but the fact that she might attempt to do so does not bar the entire deposition.

This lawsuit is predicated on non-legislative acts—the denial of time to rest and the making of various remarks to an aide—and it appears from the complaint that it would not necessarily require inquiry into such acts or the motivation for them. It therefore is not barred by the Speech or Debate Clause.  Although many issues regarding the Speech or Debate privilege will undoubtedly arise over the course of discovery, the fact that discovery may become complicated is not cause for dismissing the entire case.  *Cf. In re Sealed Case*, 494 F.3d 139, 148–54 (D.C. Cir. 2007).

The court proceeds to consider the Representative's arguments that the case should be dismissed for failure to state a claim on which relief can be granted.

### B.  Failure to State a Claim

#### i.  Failure to Accommodate

##### a. Statute of Limitations

To initiate proceedings under the Congressional Accountability Act, an employee must request counseling "no later than 180 days after the date of the alleged violation." 2 U.S.C. § 1402(a).  Ms. Floyd requested counseling on January 26, 2011.  Any claims that accrued before July 29, 2010 are therefore time-barred.  *See Britton v. Office of Compliance*, 412 F.3d 1324, 1328–29 (Fed. Cir. 2005).  Rep. Jackson Lee argues that she denied Ms. Floyd's request for an accommodation on April 26, 2010, and that her failure to accommodate claim is now time-

barred, notwithstanding the fact that she again requested the accommodation on August 6 of that year.

Courts have divided on the question of whether a new limitations clock begins running each time that a request for accommodations is made anew and denied again. The First Circuit has held that it does, *Tobin v. Liberty Mutual Ins. Co.*, 553 F.3d 121, 131–33 (1st Cir. 2009), the Ninth Circuit has said so in dicta, *Cherkosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003), and the Second Circuit has expressly reserved the question, *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 135 (2d Cir. 2003) ("[W]e do not decide what the effect would be if the employee renews the request for an accommodation."). The Ninth Circuit summarized its view as follows:

> Each of the . . . denials of the Employees' requests for [a reasonable accommodation] constitutes a discrete act of alleged discrimination. The Employees' claims are time-barred . . . . The Employees are not without a remedy, however, and, curiously, this entire appeal might well have been avoided had the Employees timely [brought their claims] after a subsequent denial. As the [employer] acknowledged at oral argument, if a new request results in a denial, the time period begins to run anew.

*Cherkosky*, 330 F.3d at 1248. The First Circuit, in turn, "rejected" the argument "that a plaintiff may not delay or restart the limitations period by making repeated requests for the same accommodation" and endorsed the view that when an employer "consistently denie[s] . . . repeated requests for accommodations . . . each denial constitute[s] a discrete act that [forms] the basis for a separate claim of discrimination and carrie[s] with it a new statute of limitations." *Tobin*, 553 F.3d at 131–32. The *Tobin* court explained that "any other approach would fail to take into account the possibility of changes in either the employee's condition or the workplace environment that could warrant a different response from the employer to renewed requests for accommodation." *Id.* at 133. But *Tobin* did not hold that "changes in either the employee's condition or the workplace environment" were necessary to re-start the limitations clock: the

21

"pivotal question" was simply "whether [the employee] made a specific request for accommodations that was denied during the statutory period[]." *Id.* Two district courts have been persuaded by the First Circuit's analysis. *Sorey v. YRC, Inc.*, 2012 WL 38255, at *4 (M.D. Tenn. Jan. 6, 2012); *Giannattasia v. City of New York*, 2011 WL 4629016, at *5 (E.D.N.Y. Sept. 30, 2011).

On the other hand, a judge in this district has held that a plaintiff who requested an accommodation outside of the limitations period and then, after her medical condition worsened, repeated the request, was barred by the statute of limitations even though her suit would have been timely based upon the second request. *Stewart v. District of Columbia*, 2006 WL 626921 (D.D.C. Mar. 12, 2006). The *Stewart* court rejected "[p]laintiff's novel argument that her aggravated disability required a wholly different level of scrutiny and interactive engagement—*i.e.*, a different interactive process," and that a second denial after that second process should give rise to a second claim. *Id.* at *6 (brackets and internal quotation marks omitted). That holding was significantly motivated by a concern that "if Plaintiff's logic were followed, any employee whose disability was exacerbated due to an employer's failure to accommodate under the ADA could simply re-start the statute of limitations by re-requesting the denied accommodations." *Id.* The *Stewart* court concluded that "[n]umerous courts have clearly stated that such a result cannot be tolerated," *id.*, but only cited cases in which a plaintiff who had suffered an adverse action (such as a termination or loss of seniority) outside of the limitations period and later requested an accommodation that would have reversed that adverse action had his claim barred by the statute of limitations, because his accommodation request was really a collateral challenge to the earlier adverse action. *See Martin v. Sw. Va. Gas Co.*, 135 F.3d 307, 310 (4th Cir. 1998) (termination); *Conner v. Reckitt & Colman, Inc.*, 84 F.3d 1100, 1102 (8th

22

Cir. 1996) (terminatation); *Kennedy v. Chemical Waste Mgmt., Inc.*, 79 F.3d 49, 50-51 (7th Cir.

1996) (loss of seniority followed by layoff).

Addressing the same issue under the D.C. Human Rights Act, another judge in this

district agreed that, per *Stewart*, a plaintiff had to file a timely claim based on "the first act of

discrimination" and could not base a claim on a later refusal of a request for the same

accommodation. *Morgenstein v. Morgan Stanley DW Inc.*, 2007 WL 315090, at *4 (D.D.C. Jan.

31, 2007). And the D.C. Court of Appeals has held that although "[a] plaintiff cannot extend the

limitations period by reiterating an identical request [for a reasonable accommodation] that was

previously denied . . . . a claim based on the denial of a new request, made in light of changed

circumstances, would not be time-barred." *Barrett v. Covington & Burling LLP*, 979 A.2d 1239,

1249–50 (D.C. 2009).[6]

If, as Rep. Jackson Lee argues, Ms. Floyd's request for an accommodation was denied on

April 26, 2010, and she again requested the same accommodation on August 6 of that year, and

was again denied on that same day, then her failure to accommodate claim would be barred under

*Stewart*, *Barrett*, and *Morgenstein*, but not under *Tobin* or *Cherkosky*. The court need not

resolve the tension between these cases on this motion, because it is not clear from Ms. Floyd's

complaint when her request for an accommodation was denied.

"[T]he denial of a disabled employee's request for accommodation starts the [statute of

---

[6] The *Barrett* court cited *Tobin* in support of its holding, which *Tobin* clearly rejected. It also cited *Long*, in which a district judge found that "it is readily apparent that defendant's negative responses to plaintiff's requests for accommodation of his disability . . . were each 'discrete acts'" on which a claim could be based. *Long*, 512 F. Supp. 2d at 17. The *Long* court held, however, that each relevant denial had occurred outside of the limitations period. *Id. Long* therefore appears to stand for the proposition that every denial of a request for accommodations gives rise to its own claim, but that what constitutes a denial is a question of fact.

limitations] clock running on the day it occurs," *Tobin*, 553 F.3d at 130, so long as the plaintiff knew or had reason to know of the denial, *see, e.g.*, *Long*, 512 F. Supp. 2d at 14.  When the denial occurred, and when the plaintiff knew or had reason to know of it, are of course questions of fact.  *See id.* at 17.

It is not altogether clear from the complaint when Ms. Floyd's request was denied.  She alleges that, on April 26, she reminded Rep. Jackson Lee about her monocular vision and requested time to rest her eyes, as well as additional time to perform assignments that required reading.  Am. Compl. at 8.  The Representative allegedly responded, "I don't care anything about your disability," and went on to say that Ms. Floyd knew what she was getting herself into when she returned to the office, and that she had better get the work done herself.  *Id.*  Later that day, Ms. Floyd wrote an email suggesting possible accommodations (although she did not frame them as such) to which Rep. Jackson Lee did not respond.  *Id.*  In June, Ms. Floyd told the newly-hired chief of staff about her monocular vision; he told her that he would discuss the matter with Rep. Jackson Lee.  *Id.*  On August 6, 2010, as Ms. Floyd alleges, the new chief of staff told Ms. Floyd that he had spoken to Rep. Jackson Lee, but that the Representative only responded "I don't give a damn about her disability."  *Id.*  Ms. Floyd told him that she believed the office was violating the Americans with Disabilities Act, and he referred her to two employment lawyers.  *Id.*

Drawing every reasonable inference in Ms. Floyd's favor, it is possible that (on these scantily alleged facts) her request for a reasonable accommodation was not actually denied until August 6—if it was even denied then.  Perhaps (as Ms. Floyd argues) she reasonably believed that she and Rep. Jackson Lee were engaged in a dialogue about the possibility of accommodating her vision condition, and the Representative's first alleged outburst was merely a passing fit of pique, not a firm and final answer.  Judging from the complaint, the conversation

between the two lacked any formal characteristics that would indicate to Ms. Floyd that her

request had been officially denied and the statute of limitations had begun to run.

The statute of limitations is an affirmative defense, and may be invoked on a 12(b)(6)

motion only "when the facts that give rise to the defense are clear from the face of the

complaint." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).  If "a

plaintiff's potential 'rejoinder to the affirmative defense [is not] foreclosed by the allegations in

the complaint,' dismissal at the Rule 12(b)(6) stage is improper."  *de Csepel v. Republic of

Hungary*, 714 F.3d 591, 608 (D.C. Cir. 2013) (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458,

466 (4th Cir. 2007) (en banc)).  Because it is not "clear from the face of the complaint" that Ms.

Floyd's request for a reasonable accommodation was denied April 26, the court need not decide

what would follow from the conclusion that it was.

### b. Qualified Individual

"To state a claim for failure to accommodate, a plaintiff must allege facts sufficient to

show that (1) he had a disability within the meaning of the ADA; (2) his employer had notice of

his disability; (3) he could perform the essential functions of the position with reasonable

accommodation; and (4) his employer refused to make such accommodation." *Hodges v. District

of Columbia*,  2013 WL 4047197, at *4 (D.D.C. Aug. 12, 2013) (citing *Gordon v. District of

Columbia*, 480 F.Supp.2d 112, 115 (D.D.C. 2007)).

Rep. Jackson Lee argues that Ms. Floyd has not adequately alleged that she was a

qualified individual within the meaning of the ADA, because she has not alleged that she could

perform the essential functions of her position with a reasonable accommodation.  The

Representative notes that "[a]ll of the accommodations purportedly requested by Plaintiff would

have relieved her of . . . [certain] duties."  Def.'s Mot. at 37.  She cites *Saunders v. Gallagher &

*Huguely Assocs., Inc.*, in which a judge in this district dismissed a failure to accommodate claim brought by a truck driver and fork lift operator who was physically unable to bend, stoop, or lift more than ten pounds.  Because the plaintiff alleged that his essential functions included "loading and unloading deliveries to customers," the court concluded that he had not alleged that he was  a qualified individual.  741 F. Supp. 2d 245, 249 (D.D.C 2010).

The essential duties of Ms. Floyd's position are a question of fact, which she has not (and need not have) alleged with particularity.  *E.g.*, *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1005 (6th Cir. 2005) ("Determining what functions are 'essential' to a particular position is a question of fact.").  Nor has Ms. Floyd alleged that she was unable to perform political duties, even if they were essential functions of her position.  Rather, she has alleged that she could only perform reading-related duties of whatever description  at a physically manageable  pace.  Although Ms. Floyd may ultimately be unable to prove that she was a qualified individual (perhaps it will turn out that working longer and harder than she was able to do was an essential function of her position) she has adequately alleged as much.  She has alleged that she "was qualified to perform her essential duties and could have been reasonably accommodated," as she was when she worked in the office as a fellow and a senior legislative assistant.  Am. Compl. at 14–15.  That is enough.

But the court notes that Ms. Floyd will not be able to prevail on her failure to accommodate claim merely by showing (as she argues here) that the Representative refused to discuss potential accommodations for her vision impairment.  As Ms. Floyd points out, the regulations implementing the ADA provide that, once an employee has requested an accommodation under that statute, "the employer must make a reasonable effort to determine the appropriate accommodation.  The appropriate accommodation is best determined through a

flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. § 1630.2(*o*)(3).[7] "To show that an employer failed to participate in this interactive process, the employee must demonstrate that: '1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) *the employee could have been reasonably accommodated* but for the employer's lack of good faith.'" *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002) (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (quoting *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 165 (3d Cir. 1999))) (emphasis added). "Because the interactive process is not an end in itself, *it is not sufficient for [the employee] to show that the [employer] failed to engage in an interactive process* or that it caused the interactive process to break down." *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005) (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996))) (brackets in original; emphasis added); *accord Ballard*, 284 F.3d at 960 ("The mere failure of an employer to engage in the interactive process does not give rise to *per se* liability. . . ."). Rather, "[t]he employee at all times retains the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his disability." *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995); *accord Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997) ("The plaintiff retains at all times the burden of persuading the jury that reasonable accommodations were available."); *Whitbeck v. Vital Signs, Inc*, 934 F. Supp. 9, 13 (D.D.C. 1996) ("At all times, the plaintiff 'bears

---

[7]   The court passes over the question of whether this regulation applies in the context of the Congressional Accountability Act, a threshold issue that neither party has raised.

the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation.'") (quoting *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994)) (emphasis deleted), *rev'd on other grounds*, 116 F.3d 588 (D.C. Cir. 1997). Ms. Floyd cannot prevail on her failure-to-accommodate claim by showing that the office of Rep. Jackson Lee refused to engage in the interactive process mandated by regulation. Instead, Ms. Floyd must establish that a reasonable accommodation would have allowed her to perform the essential functions of her job.

### ii. Hostile Work Environment

To establish a prima facie hostile work environment claim based on disability, a plaintiff must allege facts demonstrating that: (1) she is disabled or is perceived as disabled; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her disability or the perception that she was disabled; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for holding the employer liable for the creation of the hostile work environment. *See Johnson v. Shinseki*, 811 F. Supp. 2d 336, 345 (D.D.C. 2011) (discussing hostile work environment based on gender); *see also Lanman*, 393 F.3d at 1155; *Shaver*, 350 F.3d at 719; *Flowers*, 247 F.3d at 232–35; *Fox*, 247 F.3d at 175–77 (all holding that ADA provides for hostile work environment claims based on disability); *Johnson v. Billington*, 404 F. Supp. 2d 157, 169 (D.D.C. 2005) (noting that "district judges in the District of Columbia have recognized an ADA hostile work environment claim for at least a decade) (collecting cases). "Although a plaintiff is not required to plead a prima facie case of hostile work environment, the alleged facts must nevertheless support such a claim." *Shinseki*, 811 F. Supp. 2d at 345.

Urging the court to dismiss Ms. Floyd's hostile work environment claim, Rep. Jackson Lee first repeats her argument that Ms. Floyd is not a qualified individual with a disability under

the ADA; the court concludes that she has adequately alleged as much for the reasons set out above.

The Representative next argues that the hostile work environment claim is time-barred because the only hostile statement alleged within the limitations period—"I don't give a damn about her disability," Am. Compl. at 10—is merely "an insensitively worded refusal to engage in the interactive process," and cannot form the basis for a claim. Def.'s Mot. at 49–50. As to the first part of that argument—that the court should only consider the comment that Rep. Jackson Lee allegedly made on August 6, 2010, because it alone occurred within the limitations period—the Supreme Court has held that "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *see also Tobin*, 553 F.3d at 130; *Long*, 512 F. Supp. 2d at 15–16. If Ms. Floyd has adequately alleged a hostile work environment, and the August 6 comment was a "component act" of that hostile work environment, then her claim is not time-barred. It does not matter if the August 6 comment, standing alone, would not support the hostile work environment claim.

The court therefore turns to the second half of the Representative's argument: that the August 6 comment and the other incidents alleged are not sufficiently hostile for Ms. Floyd's hostile work environment claim to survive this motion. Ms. Floyd alleges that the Representative often made similar comments—which Ms. Floyd describes as "humiliating" and "derogatory," *id.* at 10—about her monocular vision and the pace at which she worked, which the Representative knew was a result of her limited vision. *Id.* at 7. And Ms. Floyd also alleges two

earlier comments: that she "should not take ten years" to accomplish certain tasks, and that Rep.

Jackson Lee did not "care anything about [her] disability." *Id.* at 7–8.

"In evaluating a hostile work environment claim, the court 'looks to the totality of the

circumstances, including the frequency of the discriminatory conduct, its severity, its

offensiveness, and whether it interferes with an employee's work performance.'" *Ayissi-Etoh v.*

*Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (quoting *Baloch v. Kempthorne*,

550 F.3d 1191, 1201 (D.C. Cir. 2008) (in turn citing *Faragher v. City of Boca Raton*, 524 U.S.

775, 787–88 (1998))).  The court has its doubts that Ms. Floyd will ultimately be able to prove

that her "workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult that

[wa]s sufficiently severe or pervasive to alter the conditions of [her] employment and create an

abusive working environment." *Grosdidier v. Broadcasting Bd. of Governors, Chairman*, 709

F.3d 19, 24 (D.C. Cir. 2013) (quoting *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (in

turn quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998))) (alterations and

internal quotation marks omitted in *Grosdidier*).  But the court cannot say as a matter of law that

the "totality of the circumstances"—which of course cannot be fully known when ruling on a

motion to dismiss, *see Johnson v. Indopco, Inc.*, 846 F. Supp. 670, 674–75 (N.D. Ill. 1994)—that

Ms. Floyd has alleged do not amount to a hostile work environment.

Ms. Floyd has alleged that Rep. Jackson Lee made "humiliating" and "derogatory"

comments about her disability, Am. Compl. at 10, and has provided several instances.  The court

is, additionally, mindful of its obligation to liberally construe the filings of a *pro se* plaintiff, even

if that obligation is lessened when the plaintiff is herself a lawyer.  *Cf. Parr v. Ebrahimian*, 774

F. Supp. 2d 234, 239 (D.D.C. 2011) ("[L]acking evidence that [the plaintiff] is an experienced

attorney, will review her filings using the same standard that would be applied to any *pro se*

plaintiff."); *Rogler v. Biglow*, 610 F. Supp. 2d 103, 104 n.2 (D.D.C. 2009) ("Despite the fact that

[the plaintiff] is a lawyer, the Court has construed her *pro se* Complaint liberally in her favor.").

Although Ms. Floyd's allegations are somewhat thin, the court will not dismiss them at this

point.  *See, e.g.*, *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 193 (D.D.C. 2008); *Powell v.

Castaneda*, 390 F. Supp. 2d 1, 11 (D.D.C. 2005) ("Because the plaintiff has alleged some

conduct in support of her claim. . . the court does not dismiss her hostile work environment claim

at this stage of the proceedings.").

### iii. Constructive Discharge

Ms. Floyd alleges that she was constructively discharged.  "A finding of constructive

discharge depends on whether the employer deliberately made working conditions intolerable

and drove the employee into 'an involuntary quit.'"  *Bishopp v. District of Columbia*, 788 F.2d

781, 789–90 (D.C. Cir. 1986) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981)).

"[C]onstructive discharge claims 'must be predicated on a showing of either intentional

discrimination, or retaliation.'"  *Mayers v. Laborers' Health & Safety Fund of North America*,

478 F.3d 364, 370 (D.C. Cir. 2007) (quoting *Carter v. George Washington Univ.*, 387 F.3d 872,

883 (D.C. Cir. 2004)).  The ADA (as incorporated by the Congressional Accountability Act)

"defines the term 'discriminate' to include 'not making reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a disability who is

an . . . employee, unless [the employer] can demonstrate that the accommodation would impose

an undue hardship on the operation of [its] business. . . .'"  *Breen*, 282 F.3d at 841 n.3 (quoting

42 U.S.C. § 12112(b)(5)(A)).  "Under the ADA's scheme . . .  it is discriminatory for a covered

employer to decline to take reasonable steps to accommodate an employee's disability, unless the

steps in question 'would impose an undue hardship on the operation of the business' of the

employer." *Aka*, 156 F.3d at 1300.

An employee need not prove discriminatory intent to establish a failure-to-accommodate claim, *see, e.g.*, *Etheridge*, 789 F. Supp. 2d at 35—that is why reasonable-accommodation claims are "not subject to analysis under [the burden-shifting framework of] *McDonnell-Douglas*," *Aka*, 156 F.3d at 1288—but if an employer deliberately denies an accommodation knowing that the denial will make working conditions so intolerable that the disabled employee will be forced to resign, then a constructive discharge claim will lie. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008) ("Assuming that [the plaintiff] was denied a reasonable accommodation that forced her to work in excess of her medical restrictions, a reasonable jury could infer that the defendants knew that [the plaintiff's] working conditions would become intolerable to a reasonable person suffering from her particular disability."); *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993) (recognizing "that a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge"). That is the essence of Ms. Floyd's constructive discharge claim. *See* Am. Compl. at 21 (discussing the "emotional and physical strain caused [by] working without a reasonable accommodation").

In her motion to dismiss, Rep. Jackson Lee argues, in essence, that the working conditions Ms. Floyd has alleged are not sufficiently grueling to support a claim of constructive discharge. But Ms. Floyd has alleged enough to support a plausible inference that the Representative knew that Ms. Floyd would be forced to quit if her disability were not accommodated, and that the Representative intended that result. Whether Ms. Floyd can prove that claim is, again, another matter.

### iv.  Retaliation

Finally, Rep. Jackson Lee argues that Ms. Floyd's claim that she was retaliated against for requesting a reasonable accommodation is not viable under the Congressional Accountability Act, which makes it

> . . . unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by this chapter, or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding under this chapter.

2 U.S.C. § 1317(a).  Attending to the language of that provision, the Representative argues that to request an accommodation is not to oppose an unlawful practice, nor to make a charge, nor to initiate nor to participate in any proceeding under the Congressional Accountability Act.  She therefore concludes that the Act allows those who request a reasonable accommodation to be retaliated against on that basis.  Several judges have agreed.  *See Hollabaugh v. Office of Architect of Capitol*, 847 F. Supp. 2d 57, 66 (D.D.C. 2012) ("A request for reasonable accommodation within the meaning of the ADA does not constitute statutorily protected activity under the CAA."); *Trawick v. Hantman*, 151 F. Supp. 2d 54, 63 (D.D.C. 2001) (holding that a request for a reasonable accommodation "does not constitute statutorily protected activity within the meaning of the Congressional Accountability Act"), *aff'd on other grounds*, 2002 WL 449777 (D.C. Cir. Feb 21, 2002); *Dean v. Hantman*, 2001 WL 1940434, at *6 (D.D.C. Aug. 8, 2001) (same).

But the retaliation provisions of the Congressional Accountability Act and the Americans with Disabilities Act are, for present purposes, indistinguishable.  Under the ADA,

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). The Eighth Circuit has acknowledged that,

> One might wonder how the theory behind [a] retaliation claim [based on a request for a reasonable accommodation] can be squared with the text of the statute. An employee who asserts a right under 42 U.S.C. § 12112(b)(5)(A) to obtain reasonable accommodation for an alleged disability has not "opposed any act or practice made unlawful by" the ADA. Nor has he "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA. On that basis, it might be thought that [such a] claim never gets out of the starting gate.

*Kirkeberg v. Canadian Pacific Ry.*, 619 F.3d 898, 907 (8th Cir. 2010). But many circuits—including the Eighth—have said that the ADA provides for such a claim, and no circuit has held the contrary. *See Coons v. Secretary of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (construing the Rehabilitation Act, which "incorporates by reference § 12203(a) of the ADA," *Hiler v. Brown*, 177 F.3d 542, 545 (6th Cir. 1999)); *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477–78 (1st Cir. 2003); *Heisler v. Metropolitan Council*, 339 F.3d 622, 632 (8th Cir. 2003); *Shellenberger v Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003); *Haulbrook v. Michelin North America, Inc.*, 252 F.3d 696, 706 (4th Cir. 2001); *see also Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 200–01 (7th Cir. 2011); *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1264–65 (10th Cir. 2001); *Silk v. City of Chicago*, 194 F.3d 788, 799–801 (7th Cir. 1999); *cf. Kirkeberg*, 619 F.3d at 908 ("[W]e are bound by *Heisler* to conclude that making such a request is protected activity for purposes of 42 U.S.C. § 12203(a).")

The First Circuit began this line of cases with its observation that

> It is questionable whether [an employee who requested a reasonable accommodation] fits within the literal language of the statute: he filed no charge, nor participated in any investigation. Moreover, he did not literally oppose any act or practice, but simply requested an accommodation . . . . It would seem anomalous, however, to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge. This would leave employees unprotected if an employer granted the accommodation and shortly

thereafter terminated the employee in retaliation.

*Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997).  The *Soileau* court therefore

assumed, *arguendo*, that the ADA protects employees who request a reasonable accommodation

from retaliation on the basis of that request.  *Id.*; *see also Benoit v. Technical Mfg. Corp.*, 331

F.3d 166, 177 (1st Cir. 2003) ("[A]s in *Soileau*, we shall assume *arguendo* that [requesting an

accommodation] brings [the plaintiff] within the ambit of 42 U.S.C. § 12203(a).").  Citing this

passage from *Soileau*, the Third Circuit then held that because "[t]he right to request an

accommodation in good faith is no less a guarantee under the ADA than the right to file a

complaint with the EEOC, and . . . the ADA protects one who engages in the latter activity," it

also protects one who engages in the former.  *Shellenberger*, 318 F.3d at 191.  Several months

later, the First Circuit noted that it had "previously assumed, without deciding, that simply

requesting an accommodation, without filing a formal charge or engaging in other specific

behaviors listed in § 12203(a), is nonetheless behavior protected from an employer's retaliation,"

and that "[o]ther circuits have similarly assumed or expressly held that requesting reasonable

accommodation is 'protected activity' under the ADA."  *Wright*, 352 F.3d at 477 (citing

*Shellenberger*, 318 F.3d at 191; *Haulbrook*, 252 F.3d at 706; *Selenke*, 248 F.3d at 1265; *Silk*, 194

F.3d at 799–801).  The court then announced, without further elaboration, that "requesting an

accommodation is protected activity for the purposes of § 12203(a)."  *Id.* at 478.  The First

Circuit now says that "[i]t is well established that 'requesting an accommodation, without filing a

formal charge or engaging in other specific behaviors listed in § 12203(a), is . . . behavior

protected from an employer's retaliation.'"  *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25,

35–36 (1st Cir. 2010) (quoting *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477–78 (1st Cir. 2003)).

Judges in this district have agreed.  *Ellison v. Napolitano*, 901 F. Supp. 2d 118, 129 (D.D.C.

2012) ("[R]equests for accommodation may constitute protected activity and therefore . . .

allegations regarding those requests may support . . . claims of retaliation . . . ."); *Ellis v.

Georgetown Univ. Hospital*, 631 F. Supp. 2d 71, 77 (D.D.C. 2009) ("Requests for

accommodation are 'protected activities' within the meaning of the ADA."); *DuBerry v. District

of Columbia*, 582 F.Supp.2d 27, 37 (D.D.C. 2008) (same).  And the D.C. Circuit has suggested

that "ordinarily, 'increas[ing an employee's] workload and tighten[ing] her deadlines in

retaliation for her seeking a reasonable accommodation . . . might suffice to defeat summary

judgment on a retaliation claim.'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1167 (D.C. Cir.

2010) (quoting *Mayers v. Laborers Health and Safety Fund of North America*, 478 F.3d 364, 369

(D.C. Cir. 2007) (per curiam)) (alterations in original).

     The Supreme Court has repeatedly held that statutes which explicitly prohibit

discrimination but remain silent as to retaliation nonetheless prohibit retaliation as well.  *See

Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (holding that, by prohibiting "discrimination

based on age," 29 U.S.C. § 633a(a), the Age Discrimination in Employment Act also prohibits

"retaliation based on the filing of an age discrimination complaint"); *Jackson v. Birmingham Bd.

of Educ.*, 544 U.S. 167, 173–74 (2005) (holding that Title IX, 20 U.S.C. § 1681(a), which

prohibits discrimination on the basis of sex, thereby prohibits retaliation because "[r]etaliation

. . . is a form of 'discrimination'" and is "'discrimination on the basis of sex' because it is an

intentional response to . . . an allegation of sex discrimination"); *Sullivan v. Little Hunting Park,

Inc.*, 396 U.S. 229, 237 (1969) (holding that 42 U.S.C. § 1982 prohibits retaliation against one

who attempts "to vindicate the rights of minorities" to be free from "racial restrictions on

property").  If the Supreme Court is willing to imply an anti-retaliation provision when

construing anti-discrimination statutes that do not contain one, this court presumes that it would

also take the considerably smaller step of construing the ADA's and Congressional Accountability Act's anti-retaliation provisions to prohibit retaliation against an employee who has requested a reasonable accommodation for her disability.

Given the weight of authority in the circuits, the Supreme Court's approach to related statutory cruxes, and the fact that it would indeed "seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge," *Soileau*, 105 F.3d at 16, the court holds that the retaliation provision of the Congressional Accountability Act, like the nearly identical provision in the Americans with Disabilities Act, protects employees who request a reasonable accommodation from retaliation on that basis.

To prove retaliation, a plaintiff must demonstrate either that she has suffered an adverse employment action or that she has been subjected to a hostile work environment. *See McGrath v. Clinton*, 666 F.3d 1377, 1379–81 (D.C. Cir. 2012) (Title VII, retaliation by adverse employment action); *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C.Cir.2006) (Title VII, retaliation by hostile work environment); *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (Title VII "contains anti-discrimination and anti-retaliation provisions that are indistinguishable from those of the ADA."). To establish retaliation by adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (in turn quoting *Washington v. Ill. Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005))). She must also show a causal link between her protected activity and the

adverse action, *see Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007), or the hostile work environment, *see Ricci v. Kerry*, 2013 WL 5329049, at *5 (D.D.C. Sept. 23, 2013) (collecting cases).  Ms. Floyd alleges retaliation by both adverse action and hostile work environment.

The allegedly materially adverse actions behind Ms. Floyd's retaliation claim are the comments supporting her claim of a hostile work environment and the denial of her requests for a reasonable accommodation.  If subjecting an employee to a retaliatorily hostile work environment were itself a materially adverse action, then that well-established doctrinal distinction has no meaning.  *Compare McGrath*, 666 F.3d at 1379–81 *with Hussain*, 435 F.3d at 366.  And if the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled.  Because Ms. Floyd has not alleged any materially adverse action, her claim for retaliation on the basis of materially adverse action will be dismissed.

For the reasons discussed above, the court concludes that Ms. Floyd has sufficiently (if barely) alleged that her "workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Grosdidier,* 709 F.3d at 24 (brackets and internal quotation marks omitted).  The only question, then, is whether she has adequately alleged a causal connection between her protected activity (the request for the accommodation) and the work environment.  *See Ricci*, 2013 WL 5329049, at *5.  Each of the particular comments that Ms. Floyd alleges were made in response to a request for accommodation.  It is impossible to tell from her complaint whether it was her disability itself or her request for accommodation or both that prompted the comments, but either conclusion would be a fair inference from the facts

alleged.  Because, construed in the light most favorable to the *pro se* plaintiff, the allegedly hostile work environment may have been a response to protected activity, the court will not dismiss her claim that she was subjected to a retaliatorily hostile work environment.

## V.  CONCLUSION

For the reasons stated above, the court will dismiss Ms. Floyd's claim for retaliation based on a materially adverse action, and will deny the remainder of this motion to dismiss.

Rudolph Contreras
United States District Judge

Date: September 30, 2013