**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MONA K. FLOYD, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 11-01228 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 49, 53 |
| | : | | |
| OFFICE OF REPRESENTATIVE SHEILA | : | | |
| JACKSON LEE, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING DEFENDANT'S MOTION TO DISMISS AND TO REVOKE PLAINTIFF'S *IN FORMA PAUPERIS* STATUS; GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

In 2010, Mona K. Floyd served as Legislative Director and Chief Counsel in the office of Congresswoman Sheila Jackson Lee.[1]  In this action, Ms. Floyd, who is proceeding *in forma pauperis*, alleges that Rep. Jackson Lee's office failed to accommodate her monocular vision, subjected her to a hostile work environment, and retaliated against her for requesting an accommodation, all in violation of the Congressional Accountability Act.  She also alleges that the office's deliberate failure to accommodate her impairment resulted in her constructive discharge.  The office of Rep. Jackson Lee moves to dismiss the action on the basis that the "allegation of poverty" in Ms. Floyd's application for *in forma pauperis* status is "untrue," 28 U.S.C. § 1915(e)(2)(A), and, in the alternative, for summary judgment on all claims.  Because the Court concludes that Ms. Floyd's "allegation of poverty" is not "untrue" and that

---

[1] Although the office and not the officeholder is the defendant in this suit, *see* 2 U.S.C. §§ 1301(9), 1408(b), the Court will sometimes refer to "the Representative" or "Rep. Jackson Lee" as though she were personally defending the claims brought against her office.

misstatements in her *in forma pauperis* application were neither material nor made in bad faith, it denies the motion to dismiss.  But because Ms. Floyd has failed to create genuine disputes of material fact as to certain elements of each of her claims, the Court grants Rep. Jackson Lee's motion for summary judgment in its entirety.

## II.  FACTUAL BACKGROUND[2]

From birth, Ms. Floyd has suffered from monocular vision, which is the inability to use one eye.  *See* Floyd Dep. at 150:6–22.[3]  This condition reduces her reading speed and causes her eye strain, eye fatigue, and headaches when reading for longer periods.  *Id.*

In January 1998, Ms. Floyd obtained her first and only medical documentation of her impairment:  To support her request for a testing accommodation for the 1998 California bar examination, Ms. Floyd had Dr. Mitchell C. Shultz, an ophthalmologist, complete the State Bar of California's physical disability verification form.  *See id.* at 152:6–10, 154:20–22; *see generally* Cal. bar exam form, Def.'s Ex. 5, ECF No. 53-4.  On the form, Dr. Shultz indicated that Ms. Floyd's disability is "monofixation syndrome," another term for monocular vision.  Cal. bar exam form 1, Def.'s Ex. 5; *see also* Floyd Dep. at 150:18–20.  In explaining the

---

[2] In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Accordingly, where facts relevant to the motion for summary judgment are disputed, the Court will view the evidence in the light most favorable to Ms. Floyd.  By contrast, Rep. Jackson Lee's motion to dismiss under 28 U.S.C. § 1615 requires the Court to weigh evidence and ascertain the truth of Ms. Floyd's "allegation of poverty."  Accordingly, the Court's description of facts relevant to the motion to dismiss will not favor any party, though most facts relevant to that motion are undisputed.

[3] Excerpts of Ms. Floyd's deposition transcript appear on the docket in several places:  ECF Nos. 49-2, 53-1, 53-2, and 53-3.  For simplicity, citations to her deposition will indicate only page and line numbers, not exhibit or docket numbers.  Given that other depositions are similarly fragmented (Mr. Berry's deposition appears in ECF Nos. 56-2 and 57-3, and Rep. Jackson Lee's deposition in ECF Nos. 53-4 and 56-1), the Court will adopt the same convention for all depositions.

impairment's impact, Dr. Shultz wrote that "this deficiency in binocular vision may be impacting [Ms. Floyd's] ability to read fast secondary to alternation between the eyes and fatigability." Cal. bar exam form 1, Def.'s Ex. 5.  He also indicated that Ms. Floyd's impairment is "permanent."  *Id.*

On the form's final page, Dr. Shultz recommended that Ms. Floyd be allowed specific amounts of additional time on certain portions of the bar examination.  Explaining his "[r]easons and basis," he wrote that Ms. Floyd "has a disability in reading secondary to alternation between eyes which prevents fluidity in reading thereby decreasing her speed of reading between 20–30 percent."  *Id.* at 3.  When questioned about the figures "20–30 percent" during her deposition, Ms. Floyd candidly testified:

> Oh, I wasn't measuring whether [sic] 20 percent or 30 percent less. The doctor is making the estimate here.  I can't judge how much faster or slower I may be reading because of my vision.  I just know that, in general, if I'm in a group and we're asked to read certain things, I see that others are finished and I'm still reading. That's what made me say to [Dr. Shultz], "I'm not finishing things."  He said, "You're relying on the one eye, and that's causing you to slow down."  When I am sitting, working. . . , I don't say I'm reading 20 percent slower here or 30 percent slower here.  I just never did anything like that.

Floyd Dep. at 168:5–17.

In September 2006, Ms. Floyd joined the Washington, D.C., office of Rep. Jackson Lee as a Congressional Black Caucus Foundation fellow.  *See id.* at 40:9–18.  About a month before Ms. Floyd's fellowship began, the Foundation informed the office by memorandum that Ms. Floyd had "a vision disability" and would "need to take special precautions to reduce the strain on her eyes."  Musgrove memo of Aug. 1, 2006, Def.'s Ex. 7, ECF No. 53-5; *see also* Floyd Dep. at 50:2–14.  The memorandum listed specific accommodations that Ms. Floyd had requested, including voice recognition software and text enlargement capabilities.  *See* Musgrove

memo of Aug. 1, 2006, Def.'s Ex. 7.  In support of these requests, Ms. Floyd had submitted to

the Foundation a copy of the disability verification form completed by Dr. Shultz.  *See* Floyd

Dep. at 57:2–6.

During her time as a fellow, Ms. Floyd's need for accommodations was satisfied, and she

had a positive relationship with the Representative.  *See id.* at 66:2–22.  Soon after joining the

office, she received the voice recognition software, and her computer had zoom capabilities.  *See*

*id.* at 53:12–17, 55:6–10.  Although Ms. Floyd had expected the voice recognition software to

enable her to type without using her eyes to read both the keyboard and screen, *see id.* at 54:2–9,

55:15–20, she soon determined that the software was more hindrance than help and had it

uninstalled, though she continued to use the zoom function for at least part of the fellowship, *see*

*id.* at 53:19–24, 56:6–24.  Because the software did not work as expected, Ms. Floyd instead

verbally requested of her direct supervisor, then-Legislative Director Gregory Berry, that she be

given rest breaks and additional time to perform assignments, and he granted her request.  *See id.*

at 44:14–18, 63:8–16.  Ms. Floyd rested whenever she started experiencing eye strain and

headaches; by her estimate, on a daily basis, she rested about ten minutes for every three hours of

intensive reading.  *See id.* at 64:4–20, 65:3–6.

After completing her fellowship, Ms. Floyd was hired in August 2007 as the office's

Director of Health Policy and Senior Legislative Assistant.  *See* Chastang email of Aug. 6, 2007,

Def.'s Ex. 10, ECF No. 53-5.  She continued to have her needs accommodated, *see* Floyd Dep. at

87:17–25, and to enjoy a "very positive" relationship with the Representative, *see id.* at 85:25–

86:4.  Ms. Floyd observed, however, that the Representative sometimes communicated in a "very

harsh" manner to other staffers and mounted "personal attacks" when she was dissatisfied with

an individual's work. *Id.* at 86:12–23.  In late 2007, Ms. Floyd resigned to pursue another

professional opportunity. *See id.* at 90:16–19, 92:2–6.

In February 2010, Rep. Jackson Lee's Chief of Staff Leon Buck recruited Ms. Floyd to be

the Representative's Legislative Director and Chief Counsel. *Id.* at 102:14–103:6; Buck Dep. at

8:11–16.  As they discussed the position, Ms. Floyd informed Mr. Buck of her "vision

limitation" and "the fact that it takes [her] longer to read."  Floyd Dep. at 104:6–7.  Moreover,

she explained that she would accept the job only under certain conditions. *See id.* at 103:12–22.

First, Ms. Floyd requested that the office employ at least one additional Legislative Assistant; at

the time, it had two. *See id.* at 107:18–110:16.[4]  Second, she requested that she not have primary

responsibility either for issue areas assigned to other staffers or for events occurring in Houston,

where the Representative's district is located; she considered such duties "nonessential," based

on her understanding of the "scope of the position," "priorities in the office," and "past practices

of the office." *Id.* at 112:14–117:15.  Mr. Buck verbally agreed to these terms, *id.* at 106:13–

111:9, and Ms. Floyd joined the office as Legislative Director and Chief Counsel in February

2010, *see* Jackson Lee letter of Feb. 22, 2010, Def.'s Ex. 13, ECF No. 53-5.

In her new post, Ms. Floyd had a wider range of legislative and supervisory

responsibilities than she had in previous roles in the office. *See* Floyd Dep. at 119:10–21.  She

not only had a greater volume of work, *see id.* at 120:16–19, but also reported to the

Representative and regularly received assignments directly from her, *see id.* at 124:2–13.  Mr.

Buck's earlier promises, moreover, did not materialize.  Although there was no formal policy

against taking rest breaks, Ms. Floyd's "additional work" for issue areas assigned to other

---

[4] Ms. Floyd's testimony is inconsistent as to the number of Legislative Assistants
employed by the office at the time: She initially testified that there was only one, Floyd Dep. at
107:7, but later stated that there were two, *id.* at 107:20, 108:4, 110:13.  This discrepancy is
immaterial, and the Court assumes that two is the correct number.

staffers and for functions taking place in Houston prevented her from taking ten-minute rest breaks as she had previously done. *Id.* at 138:2–9. As a result, she often read "continuously" for periods longer than three hours. *Id.* at 136:2–139:18. Initially, however, Ms. Floyd did not personally inform the Representative of her need for accommodation. *See id.* at 128:19–129:11.

Ms. Floyd first mentioned her monocular vision to the Representative on April 26, 2010. *See id.* at 129:19–131:16. That day, after Rep. Jackson Lee assigned Ms. Floyd several tasks with a specific deadline, Ms. Floyd explained that she would delegate certain education-related tasks to the Legislative Assistant with primary responsibility for education matters. *Id.* at 129:19–130:7. When the Representative made clear that Ms. Floyd needed to perform the tasks herself, Ms. Floyd explained her "vision disability," her inability to use one eye, and her need for "more time" to complete the tasks and for "time to take a break." *Id.* at 130:8–18. In response, the Representative stated that "she didn't care anything about [Ms. Floyd's] vision disability," reiterated that she was not to delegate any work, and told her not to "take ten years to get it done." *Id.* at 130:19–23.

That evening, Ms. Floyd decided that although Rep. Jackson Lee had shown no concern for her disability, she would still "tr[y] to find a way to get accommodations for [her] situation and be able to delegate." *Id.* at 131:12–16. She accordingly sent the Representative an email with the subject line "Legislative team." *See* Floyd email of Apr. 26, 2010, Def.'s Ex. 16, ECF No. 53-5. The email listed several suggestions for helping the legislative team overcome "challenges" and work more efficiently, one of which was to make staff "accountable for their assigned duties." *Id.* Additionally, Ms. Floyd recommended "add[ing] another legislative staffer in order to carry out [the Representative's] agenda." *Id.* Although the email did not expressly mention Ms. Floyd's monocular vision, the suggested changes would have provided her with

additional time to take rest breaks. *See* Floyd Dep. at 133:7–18. The record contains no evidence of any response from Rep. Jackson Lee.[5]

Subsequently, the Representative told Ms. Floyd "many times" (at least on "more than five" occasions) when giving her new assignments not to take "ten years" to complete those tasks. *Id.* at 171:19–172:16.[6] Each time, Ms. Floyd would remind the Representative of her "vision limitations" and need for "more time." *Id.* at 141:9–17. Despite the fact that Ms. Floyd "would often talk about . . . [her] needing rest breaks in order to prevent headaches and eye strain," the Representative "repeatedly refused to even engage in a discussion" about potential accommodations. *Id.* at 173:8–12.

In May 2010, the Representative hired Nat Thomas as her new Chief of Staff. *Id.* at 143:10–14. Shortly thereafter, Ms. Floyd informed Mr. Thomas of her monocular vision and the Representative's unresponsiveness to her requests for authority to delegate certain tasks so that she would be able to take rest breaks and have more time to complete assignments. *See id.* at 145:8–146:9. Mr. Thomas assured Ms. Floyd that he would discuss the matter with Rep. Jackson Lee. *Id.* at 146:8–9. Ms. Floyd revisited the matter with Mr. Thomas at least four times, to no avail. *Id.* at 147:11. Ultimately, during one conversation on August 6, 2010, Mr. Thomas explained that when he had mentioned Ms. Floyd's impairment, the Representative had said that "she didn't give a damn about . . . her disability." *Id.* at 148:22–24. In response, Ms. Floyd told him that the office had violated her rights, and that she was considering filing a discrimination

---

[5] The amended complaint alleges that Rep. Jackson Lee never responded to Ms. Floyd's email. *See* Am. Compl. 9.

[6] To be sure, the record does not directly indicate that all of the "ten years" comments followed the April 26, 2010, exchange. However, Ms. Floyd testified that after each "ten years" comment, she would mention her disability to Rep. Jackson Lee, *see* Floyd Dep. at 141:9–17, and that the April 26, 2010, exchange was the first time she told Rep. Jackson Lee about her disability, *see id.* at 129:19–131:16. Thus, Ms. Floyd's testimony supports an inference that all "ten years" comments followed the April 2010 conversation.

claim. *Id.* at 179:10–20.  That day, she also decided that she would resign, though she did not immediately notify the office of her decision. *See id.* at 179:6–20.

Days later, Mr. Thomas left the office, and Yohannes Tsehai replaced him as the new Chief of Staff (the third that year). *See id.* at 149:10–15, 180:3–13.  Ms. Floyd did not directly inform Mr. Tsehai of her impairment or past requests for accommodation, *see id.* at 149:16–150:5, though it was customary for departing Chiefs of Staff to tell successors about staff members with special needs, *see* Jackson Lee Dep. at 83:8–84:3.  In the month after she had decided to resign, Ms. Floyd continued her employment, planning a children's forum hosted by Rep. Jackson Lee. *See* Floyd Dep. at 193:23–194:4.

On September 7, 2010, Ms. Floyd sent a resignation email to Mr. Tsehai stating that her last day in the office would be September 17, 2010, the date of the children's forum. *See* Floyd email of Sept. 7, 2010, Def.'s Ex. 20, ECF No. 53-6; *see also* Floyd Dep. at 193:23–194:4. Attached to the email was a memorandum and complaint addressed to Rep. Jackson Lee and Mr. Tsehai, alleging that the office had violated the Americans with Disabilities Act by denying her a reasonable accommodation, and in doing so had constructively discharged her. *See* Floyd memo of Sept. 7, 2010, Def.'s Ex. 20, ECF No. 53-6; Floyd Compl., Def.'s Ex. 21, ECF No. 53-6.

On behalf of the Representative, Mr. Tsehai encouraged Ms. Floyd to return to work with accommodations and, alternatively, tried to negotiate a severance package. *See* Floyd Dep. at 213:16–215:15; Floyd-Tsehai emails of Sept. 24, 2010, Def.'s Ex. 23, ECF No. 53-6.  Rep. Jackson Lee instructed Mr. Tsehai to "bring [Ms. Floyd] back" and to provide "whatever she may need." Jackson Lee Dep. at 101:8–10.  Negotiations, however, ultimately proved unfruitful. *See* Floyd Dep. at 213:16–215:15.

In June 2011, Ms. Floyd, proceeding *pro se*, filed this suit under the Congressional Accountability Act, 2 U.S.C. §§ 1301 *et seq.*  The amended complaint asserts claims for failure to accommodate, hostile work environment, retaliation based on both discrete materially adverse actions and a hostile work environment, and constructive discharge.  *See generally* Am. Compl., ECF No. 19.  Rep. Jackson Lee moved to dismiss the amended complaint.  *See* ECF No. 22.  The Court granted the motion as to Ms. Floyd's claim for retaliation based on discrete materially adverse actions, but denied the motion as to all other claims.  *See generally Floyd v. Jackson Lee*, 968 F. Supp. 2d 308 (D.D.C. 2013) (ECF No. 26).  Subsequently, Ms. Floyd retained counsel.  *See* ECF No. 39.

Throughout this litigation, Ms. Floyd has proceeded *in forma pauperis*.  The day she filed her original complaint, the Court granted her application for *in forma pauperis* status, dated June 23, 2011, in which she reported her income and assets under penalty of perjury.  *See generally* App. to Proceed in District Court Without Prepaying Fees or Costs ("IFP App."), ECF No. 2; Fiat Order Granting Mot. Leave Proceed *In Forma Pauperis* (June 29, 2011).  In that application, Ms. Floyd declared that she was "currently unemployed and ha[d] been since September 17, 2010," the last day she reported to work as a congressional staffer for Rep. Jackson Lee.  IFP App. ¶ 2.  The application requires employed applicants to state both their "gross pay or wages" and "take-home pay or wages."  *Id.* ¶ 2.  In the next section, the application requests all income "received" during the previous twelve months, regardless of the applicant's current employment status.  *Id.* ¶ 3.  In response, Ms. Floyd reported $54,500 in congressional salary received from February to September of 2010, $9,381.09 in withdrawals from retirement accounts during

2011,[7] and $2,800 in payment for assisting her sister with errands.  *See id.* ¶3.  She also reported $1,000 held in a checking or savings account and an automobile on which she was making loan payments.  *See id.* ¶¶ 4, 5.  Ms. Floyd further averred: "It is uncertain as to what, if any money, I will receive in the future," and "[Because] I have been unemployed nine months, I have depleted most of my savings."  *Id.* ¶¶ 3, 4.

During discovery, Rep. Jackson Lee moved to dismiss the complaint with prejudice, on the basis that Ms. Floyd's "allegation of poverty is untrue" and that she had made material misrepresentations in bad faith in her application to proceed *in forma pauperis*.  28 U.S.C. § 1915(e)(2)(A); *see also* Def.'s Mot. Dismiss, ECF No. 49.  Separately, subsequent to the completion of discovery, Rep. Jackson Lee moved for summary judgment on all of Ms. Floyd's remaining claims.  *See* Def.'s Mot. Summ. J., ECF No. 53.  Both the motion to dismiss and the motion for summary judgment are now ripe for adjudication.

## III.  LEGAL STANDARDS

### A.  Dismissal for Untrue Allegation of Poverty

28 U.S.C. § 1915 governs the rights and obligations associated with *in forma pauperis* status, which exempts persons from prepaying filing fees and costs in federal court litigation. *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 196 (1993). The statute requires applicants for *in forma pauperis* status to "submi[t] an affidavit that includes a statement of all assets . . . [and that states] that the person is unable to pay . . . fees or give

---

[7] The *in forma pauperis* application does not reveal the precise date of one of these withdrawals—$4,160 from the Federal Thrift Savings Plan.  In her opposition to Rep. Jackson Lee's motion to dismiss, Ms. Floyd claims that she made the withdrawal on "March 28," and the Court assumes this to mean "March 28, 2011," given that the withdrawal appears on Ms. Floyd's 1099-R for the 2011 tax year, which Rep. Jackson Lee attached to her motion to dismiss.  *See* Pl.'s Mem. Opp'n 5, ECF No. 51; 1099-R, ECF No. 49-2.  In any event, the date of this withdrawal does not affect the Court's analysis below.

security therefor."  28 U.S.C. § 1915(a)(1).  If the court determines "at any time" that "the

allegation of poverty is untrue," it "shall dismiss the case . . . ."  *Id.* § 1915(e)(2)(A).

"Because [§ 1915(e)(2)(A)] uses the command 'shall,' dismissal is mandatory in the face

of untrue allegations of poverty."  *Oquendo v. Geren*, 594 F. Supp. 2d 9, 11 (D.D.C. 2009).  But

courts adopt a flexible approach in assessing the falsity of these allegations.  An *in forma*

*pauperis* affidavit "is sufficient which states that one cannot because of his poverty pay or give

security for the costs and still be able to provide himself and dependents with the necessities of

life."  *Rowland*, 506 U.S. at 203 (quoting *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S.

331, 339 (1948)) (internal alterations and quotation marks omitted).  Determinations of eligibility

"must be made separately in every case."  *In re Green*, 669 F.2d 779, 786 (D.C. Cir. 1981) (per

curiam); *see also Emrit v. Bank of Am., Inc.*, 566 F. App'x 265, 265 (4th Cir. 2014)

(unpublished) ("A district court has discretion to grant or deny IFP status and must base its

decision on the poverty and good faith of the applicant and the meritorious character of the

cause." (internal quotation marks and citation omitted)).  "The *in forma pauperis* statute neither

requires a litigant to demonstrate absolute destitution, nor requires dismissal for inaccuracies,

misstatements, or minor misrepresentations made in good faith."  *Vann v. Comm'r of N.Y. City*

*Dep't of Corr.*, 496 F. App'x 113, 115 (2d Cir. 2012) (unpublished) (internal quotation marks

and citations omitted).  Indeed, the purpose of § 1915(e)(2)(A) "is not to punish the litigant

whose affidavit contains an insignificant discrepancy, but to weed out the litigant who falsely

understates his net worth in order to obtain *in forma pauperis* status to which he is not entitled

based upon his true financial worth."  *Camp v. Oliver*, 798 F.2d 434, 438 n.3 (11th Cir. 1986).

On the other hand, a material misrepresentation might "rise to the level of an untrue allegation of

poverty requiring dismissal . . . ."  *Vann*, 496 F. App'x at 115.  In sum, courts must determine

whether an accurate report of the applicant's finances would have "foreclosed *in forma pauperis* eligibility." *Camp*, 798 F.2d at 438.

Although 28 U.S.C. § 1915(e)(2)(A) mandates dismissal for a false allegation of poverty, "Congress intended to leave the decision to dismiss with or without prejudice in the district court's discretion." *Mathis v. N.Y. Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir. 1998) (citation omitted). Dismissal with prejudice is an appropriate punitive measure where an *in forma pauperis* applicant provides false information in bad faith or with intent to deceive the court. *See Vann*, 496 F. App'x at 116. Relevant to a determination of bad faith are "a plaintiff's familiarity with the *in forma pauperis* system and history of litigation" and his "failure to credibly explain or correct his declarations when given an opportunity to do so." *Id.* at 115, 116.

### B.  Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475

F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

### A.  Motion to Dismiss and to Revoke *In Forma Pauperis* Status

In her motion to dismiss, Rep. Jackson Lee contends that this Court must dismiss the case with prejudice because evidence obtained during discovery demonstrates that Ms. Floyd's "allegation of poverty is untrue."  28 U.S.C. § 1915(e)(2)(A); *see generally* Mem. Supp. Def.'s Mot. Dismiss, ECF No. 49-1.

The parties' disagreement over Ms. Floyd's declared income and assets boils down to two matters.  First, Rep. Jackson Lee claims that Ms. Floyd understated the amounts of her retirement account withdrawals by $4,095, and that she accordingly withdrew $13,476, not a mere $9,381.  *See* Mem. Supp. Def.'s Mot. Dismiss 4.  This discrepancy, the parties agree, results from Ms. Floyd's use of post-tax net amounts, rather than pre-tax gross amounts.  *See* TIAA CREF letter of July 2, 2014, Pl.'s Ex. 4, ECF No. 51-4.  Second, Rep. Jackson Lee alleges that Ms. Floyd omitted $5,226 from her reported congressional staffer income, and that she earned $59,726, not $54,500.  *See* Mem. Supp. Def.'s Mot. Dismiss 3–4.  Ms. Floyd concedes that the $54,500 figure excludes her student loan reimbursements but disputes the relevance of the $59,726 figure—her total Social Security and Medicare wages appearing on her 2010 W-2.  *See* W-2 box 3, 5, Pl.'s Ex. 2, ECF No. 51-2.  She further contends that, in any event, she actually *over*-stated her staffer income by $29,501, since the *in forma pauperis* application asked only for her income from the twelve months preceding her application (June 23, 2010–June 23,

2011), whereas she reported all of her congressional salary—less student loan reimbursements—from February 2010 onward.  *See* Pl.'s Mem. Opp'n 3–4, ECF No. 51.

At the outset, the Court rejects Rep. Jackson Lee's *arguendo* contention in her reply that dismissal is mandatory because, even if the Court were to accept all of Ms. Floyd's figures, her income during the twelve-month period preceding her application would still exceed the 2011 poverty threshold of $11,702 in annual income, as defined by the U.S. Census Bureau.  *See* Def.'s Reply 7 (citing Mem. Supp. Def.'s Mot. Dismiss 13).  Rep. Jackson Lee cites no authority for the proposition that the U.S. Census Bureau's poverty line defines *in forma pauperis* status.[8] 28 U.S.C. § 1915 incorporates no precise poverty threshold, and Congress knows how to write statutes that do.[9]  Moreover, as explained above, a hard quantitative income threshold is foreign to the *in forma pauperis* determination, which is a discretionary assessment of a plaintiff's ability to "pay or give security for the costs [of litigation] and still be able to provide himself and dependents with the necessities of life."  *Rowland*, 506 U.S. at 203; *see also In re Green*, 669 F.2d at 786.  Lastly, Rep. Jackson Lee's income-based threshold would overlook assets, debts, and other factors relevant to assessing a litigant's ability to pay court fees and costs.[10]

---

[8] Rep. Jackson Lee does cite *Johnson*'s passing observation that: "[I]t is clear that [the plaintiff's] standard of living is nowhere near the Government's established poverty level." *Johnson v. Spellings*, 579 F. Supp. 2d 188, 191 (D.D.C. 2008).  In *Johnson*, the plaintiff "underestimate[d] her assets by more than $562,000."  *Id.* at 190.  This Court does not read this observation to mean that any government poverty threshold dictates *in forma pauperis* determinations; rather, the *Johnson* court simply noted that an *in forma pauperis* applicant is not sufficiently impoverished when her wealth departs drastically from common understandings of poverty.

[9] *Cf.* 28 U.S.C. § 1930(f)(1) (providing for waiver of bankruptcy case filing fee for individual with "income less than 150 percent of the income official poverty line (as defined by the Office of Management and Budget, and revised annually in accordance with section 673(2) of the Omnibus Budget Reconciliation Act of 1981) applicable to a family of the size involved and is unable to pay that fee in installments").

[10] Even the U.S. Census Bureau explains that its income thresholds exclude capital gains and serve only as a "statistical yardstick, not as a complete description of what people and

Although no hard quantitative threshold exists, the Court must, of course, assess the truth

of Ms. Floyd's "allegation of poverty."  28 U.S.C. § 1915(e)(2)(A).  The Court finds that Ms.

Floyd overstated her congressional staffer income significantly, though not by as much as she

claims: Her reportable gross congressional salary amounted to $33,332—$21,168 less than the

amount that she reported.[11]  As for her retirement account withdrawals, the Court concludes that

her reporting of only net amounts was insufficient.  The application requires employed applicants

to report both "gross pay" and "take-home pay," IFP App. ¶ 2, and although Ms. Floyd was

unemployed, she should have reported her gross total retirement account withdrawals of

$13,074.11, alongside the after-tax total, *id.* ¶ 3; TIAA CREF letter of July 2, 2014, Pl.'s Ex. 4.[12]

The remaining data are undisputed, though still relevant—$2,800 received from her sister,

---

families need to live."  How the Census Bureau Measures Poverty, U.S. Census Bureau,
http://www.census.gov/hhes/www/poverty/about/overview/measure.html  (last visited Mar. 31,
2015).  By contrast, the *in forma pauperis* application gives a fuller picture of an applicant's
finances, requiring reporting of *all* income sources, as well as all assets and debts.  *See* IFP App.
¶ 3(f) (requiring reporting of "[a]ny other sources" of income); *id.* ¶ 5 (requiring reporting of
"[a]ny . . . thing of value that [the applicant] own[s]").  Rep. Jackson Lee's threshold also seems
unworkable for assessing *in forma pauperis* applications of prisoners, who have limited income
and expenses.  *Cf. Vann*, 496 F. App'x at 116 (denying motion for leave to proceed IFP on
appeal where prisoner had received $2,059.10 in deposits during preceding twelve months);
*Martin v. United States*, 317 F. App'x 869, 870–71 (11th Cir. 2008) (unpublished) (affirming
denial of IFP application where district court found that prisoner had received $1,818 in deposits
in the preceding six months but "chose to spend those funds on matters other than this
litigation").

[11] The income that Ms. Floyd *received* between June 23, 2010, and June 23, 2011,
includes her salary for the June 2010 pay period, which she received on June 30, 2010.  *See*
Paystubs, Pl.'s Ex. 3, ECF No. 51-3.

[12] This figure is the sum of the TIAA CREF withdrawals in 2011 of $3,950 and
$2,765.11, and the $6,359 withdrawn from the Federal Thrift Savings Plan.  Rep. Jackson Lee's
figure included Ms. Floyd's August 2011 withdrawal of $402.21 from her TIAA CREF account,
but this withdrawal occurred after the filing of her *in forma pauperis* application on June 23,
2011.  *See* TIAA CREF letter of July 2, 2014, Pl.'s Ex. 4.

$1,000 in cash or in a bank account, her $1,233 retirement account balance,[13] and her

automobile.

On the basis of these figures, the Court declines in its discretion to find that Ms. Floyd's

"allegation of poverty is untrue."  28 U.S.C. § 1915(e)(2)(A).  In arguing over the amount of Ms.

Floyd's reportable 2010 congressional income, both parties overlook one crucial, undisputed

fact: At the time of her *in forma pauperis* petition, Ms. Floyd was unemployed and no longer

receiving income as a congressional staffer.  Indeed, she received her final paycheck on

September 30, 2010, nearly nine months before she applied for *in forma pauperis* status.  *See*

Paystubs, Pl.'s Ex. 3, ECF No. 51-3.  Thus, even the $33,332 in congressional salary that Ms.

Floyd should have reported does not weigh significantly against granting her *in forma pauperis*

status.  *Cf. Robinson v. Koch Foods of Ala.*, No. 2:13-CV-557, 2014 WL 4472609, at *2 (M.D.

Ala. Sept. 11, 2014) (finding that income earned ten months before IFP application, even if

reported, "would have made no difference to the . . . decision to grant . . . IFP status").

Moreover, Rep. Jackson Lee does not dispute Ms. Floyd's statement in her application that she

had "depleted most of [her] savings."  IFP App. ¶ 4.[14]  The fact that Ms. Floyd largely exhausted

---

[13] Although Ms. Floyd did not initially report this retirement account balance, she concedes this omission in her opposition to the motion to dismiss, and Rep. Jackson Lee does not dispute this amount in reply.  *See* Pl.'s Mem. Opp'n 5–6.

[14] Rep. Jackson Lee claims that the Court should find "misleading" Ms. Floyd's assertion that her future income was "uncertain," given that she withdrew from a retirement account another $402.21 just over a month after submitting her application.  *See* Mem. Supp. Def.'s Mot. Dismiss 9.  Relatedly, Rep. Jackson Lee derives from *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305 (7th Cir. 2002), the proposition that applicants have a general "obligation to amend" an *in forma pauperis* application upon receiving any subsequent income.  Mem. Supp. Def.'s Mot. Dismiss 9.  As to the first point, the Court does not find Ms. Floyd's claim that her income was "uncertain" to be misleading, given that at the time of her application, her retirement accounts had already been largely liquidated, and there is no evidence that she had any steady income or concrete plans to withdraw further amounts.  Secondly, the Court does not read *Thomas* as supporting a general "obligation to amend."  The *Thomas* court faulted the plaintiff for failing to disclose a substantial retirement account distribution for $58,990 that was

her retirement accounts in the months after becoming unemployed is further probative of her limited means.  In sum, at the time of her application, Ms. Floyd was unemployed and without any steady income; she had already liquidated most of her retirement accounts; and her assets were limited to $1,000 in cash or bank holdings, her $1,233 retirement account balance, and her automobile.  A plaintiff need not "demonstrate absolute destitution" to qualify for *in forma pauperis* status.  *Vann*, 496 F. App'x at 115.  On this record, the Court concludes that Ms. Floyd's allegation of poverty is not "untrue."  28 U.S.C. § 1915(e)(2)(A).

Moreover, although Ms. Floyd's *in forma pauperis* application was not error-free, Rep. Jackson Lee has not demonstrated that any misstatements were material or made with intent to deceive the Court.  As for lack of materiality, the student loan reimbursements and the taxes paid on her retirement account withdrawals amount, at most, to a few thousand dollars, and in any event, do not impact Ms. Floyd's ability to pay court fees given that she did not directly receive the funds.  *Cf. Johnson v. Spellings*, 579 F. Supp. 2d 188, 190–91 (D.D.C. 2008) (dismissing complaint upon finding that the plaintiff, an accountant, admitted that she underestimated her assets by more than $562,000 in order to avoid paying court fees).  In particular, evidence of her omitted student loan reimbursements is a wash: Even if she had listed this amount as income, she would have been able to list the loan as a debt (which she did not).  *See* IFP App. ¶ 8 ("Any debts or financial obligations").  Dismissal under § 1915(e)(2)(A) should not be based on "inaccuracies, misstatements, or minor misrepresentations made in good faith."  *Vann*, 496 F.

---

completed after the application, but which he had initiated before applying for *in forma pauperis* status.  *See Thomas*, 288 F.3d at 306.

App'x at 115.  And ultimately, the omitted amounts are more than eclipsed by Ms. Floyd's $21,168 overstatement of her congressional salary.[15]

Nor is there evidence to show that Ms. Floyd acted in bad faith, with intent to obtain *in forma pauperis* status by deception, such that dismissal with prejudice might be warranted.[16] Rep. Jackson Lee makes much of the fact that Ms. Floyd is an attorney familiar with the consequences of making statements "under penalty of perjury."  Mem. Supp. Def.'s Mot. Dismiss 7.  But Ms. Floyd's general knowledge of what "perjury" means (assumed to be properly imputed to her) is wholly distinct from knowledge of what statements would constitute perjury in this particular context.  Here, there is no evidence that Ms. Floyd had any special "familiarity with the *in forma pauperis* system" or prior experience with *in forma pauperis* applications through a "history of litigation."  *Vann*, 496 F. App'x at 115.[17]  The closest issues

---

[15] The Court finds Rep. Jackson Lee's other factual quibbles to be immaterial.  Rep. Jackson Lee ventures so far as to claim that Ms. Floyd's reporting September 17, 2010, as her last day of work on the basis that it was her final day in the office, as opposed to September 30, 2010, when she received her final paycheck, "strains credibility [sic]."  Mem. Supp. Def.'s Mot. Dismiss 10.  In passing, Rep. Jackson Lee also asserts that Ms. Floyd's "savings would, in theory, include her 2010 wages," *id.* at 13, but there is no evidence that Ms. Floyd had saved a significant amount of her 2010 wages, and Rep. Jackson Lee does not dispute that as of June 2011, Ms. Floyd had only $1,000 in cash or in a bank account, IFP App. ¶ 4.

[16] *Cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (explaining that court may draw on "inherent power to police itself" and award attorneys' fees sanction if "fraud has been practiced upon it" or a party "shows bad faith by delaying or disrupting the litigation"); *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995) (explaining that proof by "clear and convincing evidence" of misconduct in litigation is prerequisite for imposing punitive inherent power sanctions).

[17] To be clear, a court could find that the "truth" of an overarching allegation of poverty remains intact and that any mistakes are minor, but still find that certain false reports were made in bad faith.  Because the evidence of bad faith here is insufficient, the Court need not determine today how it would exercise its discretion in such a scenario, though it appears that other courts generally favor dismissal.  *See Vann*, 496 F. App'x at 115 ("[A]lthough a [person's] misrepresentation of his or her financial assets might not necessarily rise to the level of an untrue allegation of poverty requiring dismissal in all cases, dismissal under § 1915(e)(2)(A) is certainly appropriate where a plaintiff conceals or misrepresents his or her financial assets or history in bad faith to obtain *in forma pauperis* status."); *Chriswell v. Big Score Entm't, LLC*, No. 11 C

are Ms. Floyd's ill-considered decisions to deduct student loan reimbursement amounts from her gross salary and to report only post-tax, net retirement account withdrawals.[18] But given that the *in forma pauperis* application ambiguously asks for income "received," the Court declines, in the absence of other evidence, to find bad faith. *See* IFP App. ¶ 3.[19]

Lastly, the Court addresses the role of credibility determinations. Ms. Floyd is correct that credibility judgments concerning the merits of this case (*e.g.*, whether she has a disability) are the province of a jury. *See* Pl.'s Mem. Opp'n 7. But here, the Court may make credibility judgments relevant to determining whether her allegation of poverty is "untrue" under § 1915(e)(2)(A). *Cf. Vann*, 496 F. App'x at 116 (affirming dismissal with prejudice in part because of plaintiff's "failure to *credibly* explain or correct his declarations when given an opportunity to do so" (emphasis added)); *Johnson*, 579 F. Supp. 2d at 190 (finding plaintiff's

---

00861, 2013 WL 3669074, at *6 & n.10 (N.D. Ill. July 12, 2013) (ordering plaintiff to pay $55 sanction after finding that she was in fact indigent, and that she had intentionally omitted various assets and income in her IFP application, but explaining that had she acted in bad faith, "dismissal with prejudice would be warranted").

[18] Ms. Floyd's reluctance in her deposition to acknowledge that she referenced her paystub in preparing the application is concerning, though the passage of three years might have clouded her memory. *See* Floyd Dep. at 15–22. In any event, given the relatively small amounts at issue, the ambiguity in the application's language, and her ultimate overstatement of her income, the Court declines to find that the omission stemmed from bad faith.

[19] In finding that this record contains insufficient evidence of bad faith, the Court declines to follow the Eighth Circuit's opinion in *Romesburg v. Trickey*, 908 F.2d 258 (8th Cir. 1990), which affirmed a dismissal with prejudice based on a finding of bad faith. *Id.* at 260. The district court there had found bad faith where the prisoner-plaintiff acknowledged that he failed to disclose his ownership of real property, but explained that his elderly wife lived in a house on the property, which in any event was worth only $5,000, and that a "jailhouse lawyer" had advised him that real property ownership was "not relevant" to *in forma pauperis* status. *Id.* at 259.

testimony "patently incredible").   Nonetheless, the Court finds insufficient evidence for doubting either Ms. Floyd's good faith or the ultimate veracity of her allegation of poverty.[20]

Because Ms. Floyd's "allegation of poverty" is not "untrue," dismissal is not mandated by 28 U.S.C. § 1915(e)(2)(A).   Moreover, because the Court finds no evidence of bad faith, dismissal with prejudice is unwarranted.   The Court does not condone the apparent sloppiness with which Ms. Floyd, a trained attorney, prepared her submission to the Court.   But her errors were both in her favor and to her detriment.   Accordingly, the Court denies Rep. Jackson Lee's motion to dismiss and to revoke Ms. Floyd's *in forma pauperis* status.

### B.   Failure to Provide a Reasonable Accommodation

Ms. Floyd alleges that Rep. Jackson Lee failed to provide a reasonable accommodation for her monocular vision disability, in violation of the Congressional Accountability Act.   *See* Am. Compl. 11–16.

The Congressional Accountability Act extends the protections of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, to employees of congressional offices. *See Oscarson v. Office of Senate Sergeant at Arms*, 550 F.3d 1, 2 (D.C. Cir. 2008) (citing 2 U.S.C. § 1311(a)(3)).   The ADA, in turn, provides that no covered entity shall "discriminate against a qualified individual on the basis of disability."   42 U.S.C. § 12112(a).   Such discrimination includes "not making reasonable accommodations" for a "qualified individual with a disability," unless doing so would constitute an undue hardship.   *Id.* § 12112(b)(5)(A).   In order to make out a prima facie case for a failure-to-accommodate claim under the ADA, a plaintiff must show that "(i) she was disabled within the meaning of the [ADA]; (ii) her

---

[20] Specifically, the Court finds that Ms. Floyd's inconsequential errors and her statement in her 2011 tax return that she was not disabled do not undermine her credibility as pertinent to her allegation of poverty.  *See* Mem. Supp. Def.'s Mot. Dismiss 14–15.

employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability."  *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (setting forth elements of a Rehabilitation Act failure-to-accommodate claim) (internal citations omitted); *see also id.* at 5 (explaining that ADA and Rehabilitation Act standards for failure-to-accommodate claims are identical).[21]

In her motion for summary judgment, Rep. Jackson Lee asserts that the evidence cannot establish any of the four prima facie elements of a failure-to-accommodate claim.  *See* Def.'s Mem. Supp. Mot. Summ. J. 15–28, ECF No. 53.[22]  Below, the Court considers each element in turn.

### 1. Disability

Rep. Jackson Lee first contends that she is entitled to summary judgment on Ms. Floyd's failure-to-accommodate claim because the evidence cannot sufficiently support a finding that Ms. Floyd had a "disability" under the ADA.  *See* Def.'s Mem. Supp. Mot. Summ. J. 15–20.

The ADA provides three definitions for "disability," with respect to an individual:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment[.]

---

[21] Rep. Jackson Lee relies on *Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27 (D.D.C. 2011), for the elements of the prima facie case, but that opinion misstates the "qualified individual" element: An individual is "qualified" if she can perform her essential duties with *or without* reasonable accommodation.  *See id.* at 35; *see also Martin v. District of Columbia*, No. 11-cv-01069, 2015 WL 294723, at *28 n.58 (D.D.C. Jan. 23, 2015).

[22] Rep. Jackson Lee does not assert the affirmative defense that provision of a requested accommodation would have constituted an undue hardship.  *See* 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.15(d); *Norden v. Samper*, 503 F. Supp. 2d 130, 145 (D.D.C. 2007).

*Id.* § 12102(1).  In passing the ADA Amendments Act of 2008 ("ADAA"), Congress expressly

rejected the Supreme Court's previous narrow interpretation of "disability."  *See* ADAA, Pub. L.

No. 110–325, § 2(b)(4), 122 Stat. 3553, 3554 (2008).  As amended, the ADA provides that the

term "disability" "shall be construed in favor of broad coverage of individuals . . . ."  42 U.S.C.

§ 12102(4)(A).  Similarly, "substantially limits" must be "interpreted consistently with the

findings and purposes of the [ADAA]," and an impairment need substantially limit only one

major life activity to qualify as a disability.  *Id.* § 12102(4)(B), (C).  Such "major life activities"

include "reading."  *Id.* § 12102(2)(A).  To be sure, while the ADAA "makes it *easier* to prove a

disability, it does not *absolve* a party from proving one."  *Neely v. PSEG Tex., Ltd. P'ship*, 735

F.3d 242, 245 (5th Cir. 2013); *see also* 29 C.F.R. § 1630.2(j)(1)(ii) ("[N]ot every impairment

will constitute a disability within the meaning of this section.").[23]

As amended after the ADAA's enactment, the Equal Employment Opportunity

Commission ("EEOC") regulations provide that the phrase "substantially limits" is "not meant to

be a demanding standard," 29 C.F.R. § 1630.2(j)(1)(i), and shall be construed "to require a

degree of functional limitation that is lower than the standard" that predated the ADAA, *id.*

§ 1630.2(j)(1)(iv).[24]  An impairment qualifies as a disability "if it substantially limits the ability

---

[23] The ADAA took effect on January 1, 2009, *see* ADAA, Pub. L. No. 110–325, § 8, 122 Stat. 3553, 3559 (2008), and the statute does not have retroactive effect, *see Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 939–42 (D.C. Cir. 2009).  But the ADAA's lack of retroactive effect does not help Rep. Jackson Lee: Ms. Floyd alleges that *in 2010*, she provided notice of her disability and was denied a reasonable accommodation.  *See infra* Part IV.B.2; Am. Compl. 4–10.

[24] Before the ADAA, the level of deference warranted by EEOC regulations interpreting "disability" was an open question, given that the ADA did not expressly delegate interpretive authority to that agency.  *See, e.g.*, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479–80 (1999) (declining to consider question); *accord Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1102 (D.C. Cir. 2007).  But in the ADAA, Congress expressly delegated to the EEOC "the authority to issue regulations implementing the definitions of disability in [42

of an individual to perform a major life activity as compared to most people in the general population," though it "need not prevent, or significantly or severely restrict" such activity. *Id.* § 1630.2(j)(1)(ii). Comparing an individual's performance of a major life activity to that of most people in the general population "usually will not require scientific, medical, or statistical analysis," though such evidence is permissible "where appropriate." *Id.* § 1630.2(j)(1)(v). Moreover, "in determining whether an individual is substantially limited in a major life activity, it may be useful . . . to consider . . . the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." *Id.* § 1630.2(j)(4)(i). Lastly, courts applying the actual or "record of" definitions of "disability" should focus their analysis on the existence of a substantial limitation, "not on what outcomes an individual can achieve" in spite of an impairment. *Id.* § 1630.2(j)(4)(iii).

Here, Ms. Floyd alleges that because her monocular vision substantially limited her ability to read, she had a disability as defined in the ADA. *See* Am. Compl. 12.[25] The parties

---

U.S.C. §] 12102." 42 U.S.C. § 12205a. The Court thus gives the EEOC regulations "controlling weight." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

Additionally, the EEOC regulations defining "disability," which were amended in 2011, do not expressly provide for any retroactive effect, and the events in this case occurred in 2010. But the 2010 regulations' definition of the critical phrase "substantially limits" directly conflicts with the ADAA. *See* 29 C.F.R. § 1630.2(j) (2010) (defining "substantially limits" to mean "[u]nable to perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity"). Accordingly, the Court applies the amended EEOC regulations retroactively, and unless otherwise noted, all EEOC regulations cited in this Memorandum Opinion correspond to the 2011 edition of the Code of Federal Regulations. *See Gregor v. Polar Semiconductor, Inc.*, No. 11-cv-3306, 2013 WL 588743, at *3 n.5 (D. Minn. Feb. 13, 2013) ("[T]he amended EEOC regulations are persuasive indicia of Congress's intent when promulgating the ADAAA.").

[25] The amended complaint alleges that in addition to reading, Ms. Floyd's monocular vision also limits the major life activities of "concentrating" and "thinking." Am. Compl. 12. The Court will not consider these major life activities, given that the record is silent as to any limitations on these abilities of Ms. Floyd. In their summary judgment filings, the parties seem

do not dispute that Ms. Floyd's monocular vision is a "physical . . . impairment" or that reading is a "major life activit[y]" under the ADA.  42 U.S.C. § 12102(1)(A), (2)(A).  They disagree, however, as to whether Ms. Floyd has met her burden at summary judgment to proffer evidence that her monocular vision "substantially limits" her ability to read.  *Id.* § 12102(1)(A).  This inquiry is particularly important in light of the Supreme Court's guidance that although monocular vision will "ordinarily" qualify as a disability, the ADA still "requires monocular individuals . . . to prove a disability by offering evidence that the extent of the limitation [of their visual abilities] is substantial."  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999).[26] For the reasons given below, the Court concludes that Dr. Shultz's 1998 diagnosis—and this evidence alone—creates a genuine dispute of material fact as to whether Ms. Floyd's monocular vision "substantially limits" her ability to read and, accordingly, constitutes a disability under the ADA.[27]

---

to agree that in addition to reading, the major life activity of "seeing" is also at issue.  *See* Def.'s Mem. Supp. Mot. Summ. J. 16 (citing Floyd Dep. at 155–56).  But nowhere does the amended complaint allege that Ms. Floyd's major life activity of "seeing" is impacted, and "a party may not amend its complaint or broaden its claims through summary judgment briefing."  *District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010).  In any event, the major life activity of "reading" suffices for this analysis, since an impairment need only limit one major life activity to qualify as an actual disability.  *See* 29 C.F.R. § 1630.2(j)(1)(viii).

[26] Although *Kirkingburg* was decided before the ADAA was enacted, nothing in the ADAA or amended regulations undermines its holding that individuals who suffer from monocular vision are not *per se* disabled and must establish that the limiting effects of their impairment are substantial.  *See* Pl.'s Mem. Opp'n 22; *see also* 29 C.F.R. § 1630.2(j)(3)(ii) (identifying several impairments, not including monocular vision, that "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity").

[27] Ms. Floyd does not rely on the "record of" definition of disability.  *See* Am. Compl. 12; 42 U.S.C. § 12102(1).  Thus, the Court need not consider Rep. Jackson Lee's alternative argument that Ms. Floyd has not offered evidence sufficient to establish that she had a "record of" an impairment that substantially limits one or more major life activities.  *See* Def.'s Mem. Supp. Mot. Summ. J. 20 n.12; Def.'s Reply 5–6; *see also Adams v. Rice*, 531 F.3d 936, 945–46 (D.C. Cir. 2008) ("The 'record of' definition [of disability] was tailor-made for plaintiffs who . . . claim they once suffered from a physical or mental impairment that substantially limited a major

Ms. Floyd's deposition testimony does not suffice to create a dispute of material fact,

though not for the reasons asserted by Rep. Jackson Lee.  Ms. Floyd testified in her deposition

that her monocular vision "limits [her] reading speed."  Floyd Dep. at 150:11.[28]  In explaining

her reduced reading speed, she explained: "[I]n general, if I'm in a group and we're asked to read

certain things, I see that others are finished and I'm still reading."  *Id.* at 168:8–11.  Additionally,

Ms. Floyd stated that when she undertakes "intensive reading for long periods of time, there's

the stress that causes physical pain, headaches, [and] eye strain . . . ."  *Id.* at 150:15–17.

Relying on *Rumbin v. Association of American Medical Colleges*, 803 F. Supp. 2d 83

(D. Conn. 2011), Rep. Jackson Lee contends that Ms. Floyd's testimony fails to reference any

"objective measures" of the extent of her monocular vision.  Def.'s Mem. Supp. Mot. Summ. J.

16, 18.  But nowhere does *Rumbin* hold that "objective measures" are *necessary* for establishing

disability.  *See Rumbin*, 803 F. Supp. 2d at 94 (noting that the "only objective measures" of the

plaintiff's convergence insufficiency did not indicate substantial impairment of ability to see,

learn, and read).[29]  Rather, the *Rumbin* court was weighing evidence after a bench trial, not

---

life activity, recovered from the impairment, but nonetheless faced employment discrimination
because of it.").

 Nor does Ms. Floyd allege that she was "regarded as" having an impairment that
substantially limits her ability to read, under the third definition of "disability."  42 U.S.C.
§ 12102(1).  "The purpose of 'regarded as' claims is to protect employees from misperceptions
that often result from stereotypic assumptions not truly indicative of individual ability."  *Gasser
v. District of Columbia*, 442 F.3d 758, 763 (D.C. Cir. 2006) (internal quotation marks and
alterations omitted).  In any event, individuals who are *only* "regarded as" having a disability are
not entitled to a reasonable accommodation, in contrast to individuals who have either an actual
disability or a record of such disability.  *See* 29 C.F.R. § 1630.2(g)(3), (o)(4).

[28] *See also* Floyd Dep. at 159:8–9 ("The extent of the limitation is that . . . in terms of
reading, it takes me longer.").

[29] Contrary to Rep. Jackson Lee's claim that *Rumbin* was a "monocular vision case,"
Def.'s Mem. Supp. Mot. Summ. J. 16, Rumbin claimed that he suffered from convergence
insufficiency, which "occurs when an individual tries to turn his eyes inwards, towards each

opining on the sufficiency of evidence at summary judgment.  *See Girard v. Lincoln College of New England*, 27 F. Supp. 3d 289, 296 (D. Conn. 2014) (further noting that *Rumbin* did not "expressly conside[r] the findings and purposes of the ADAA").  Moreover, the EEOC regulations expressly provide that "scientific, medical, or statistical analysis" is unnecessary to sustain a finding of disability.  29 C.F.R. § 1630.2(j)(1)(v).[30]

Ultimately, however, the Court agrees with Rep. Jackson Lee that Ms. Floyd's deposition testimony, standing alone, does not suffice to create a dispute of material fact.  Her statements about her reading speed could support a finding that her reading suffers from *some degree* of limitation, but they are too vague to support a finding that any such limitation is "substantia[l]."  42 U.S.C. § 12102(1)(A).  Nor can her statement about experiencing "physical pain, headaches, [and] eye strain" after "intensive reading for long periods of time" support a finding of disability, Floyd Dep. at 150:15–17, because Ms. Floyd offers no elaboration on the meaning of "long periods," or, relatedly, how her condition limits her ability to read "as compared to most people in the general population," who might also suffer pain and discomfort after reading continuously,

_____

other, resulting in difficulty in visually focusing on close-in objects," *Rumbin*, 803 F. Supp. 2d at 86.

[30] Like Rep. Jackson Lee, the Court is perplexed by Ms. Floyd's claim in her opposition that "[t]he *combination of* Plaintiff's monocular vision *and hyperopia* contribute [sic] to the substantial limitations she faces in reading and seeing."  Pl.'s Mem. Opp'n 22 (emphasis added); *see also* Def.'s Reply 6 n.8 (discussing addition of hyperopia claim).  Hyperopia, or farsightedness, is nowhere mentioned in the amended complaint, which asserts throughout that Ms. Floyd "suffers from the disability of monocular vision . . . ."  Am. Compl. 2; *see also id.* at 12–13.  Because Ms. Floyd may not amend her complaint through summary judgment briefing, the Court does not consider any evidence of her hyperopia here.  *See Barrie*, 741 F. Supp. 2d at 263.  Even if Ms. Floyd had amended her complaint, the ADA provides that "[t]he ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses *shall be considered* in determining whether an impairment substantially limits a major life activity."  42 U.S.C. § 12102(4)(E)(ii) (emphasis added); *see also* 29 C.F.R. § 1630.2(j)(1)(vi) (same).  Although Ms. Floyd has attached to her opposition her contact lens prescription, *see* Prescription, Pl.'s Ex. 3, ECF No. 56-3, she makes no attempt to account for any "ameliorative effects" of her contact lenses, as required by statute, 42 U.S.C. § 12102(4)(E)(ii).

29 C.F.R. § 1630.2(j)(1)(ii); *Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1102 (D.C. Cir. 2007) ("[A] person who can walk for 10 miles continuously is not substantially limited in walking merely because, on the eleventh mile, he or she begins to experience pain, because most people would not be able to walk eleven miles without experiencing some discomfort." (citation omitted)).[31]  What comes closest in Ms. Floyd's deposition to establishing a dispute of material fact is her remark that whenever she reads in a group, she "see[s] that others are finished and [she is] still reading."  Floyd Dep. at 168:8–11. But this statement, too, falls short: Because she does not explain how much longer (in either relative or absolute terms) she needs to complete reading assignments, a jury could not find on this basis that her reading ability is "substantially limit[ed]."  42 U.S.C. § 12102(1)(A).

Rep. Jackson Lee claims that certain other evidence *forecloses* a finding that Ms. Floyd had a disability, but this evidence is not dispositive.  First, Rep. Jackson Lee points to Ms. Floyd's resume, which lists several instances of "past employment requiring substantial visual focus."  Def.'s Mem. Supp. Mot. Summ. J. 19.  But the EEOC regulations specifically instruct courts not to focus on "what outcomes an individual can achieve," because past successes might reflect the individual's additional effort or mitigating measures, which cannot (except for glasses or contacts) be considered.  29 C.F.R. § 1630.2(j)(4)(iii); *see also id.* § 1630.2(j)(1)(vi).  Next, Rep. Jackson Lee claims that on the "Preparer Use Form" of her 2011 tax return, Ms. Floyd reported under penalty of perjury that neither she nor anyone in her household had a disability. *See* Def.'s Mem. Supp. Mot. Summ. J. 19–20 (discussing Preparer Use Form, Def.'s Ex. 28, ECF

---

[31] Although *Singh* was decided under the pre-ADAA definition of "disability," the illustration quoted here is still valid because it is based on the "general population" test, as then articulated by the Department of Justice.  *See Singh*, 508 F.3d at 1102.  In fact, the illustration appears verbatim in the EEOC's interpretive guidance in the post-ADAA appendix to the regulations.  *See* 29 C.F.R. §1630.2(j)(4), App.

No. 53-7).  But definitions of "disability" are context-specific, and the Court is told nothing about the Internal Revenue Service's definition of "disability."  Accordingly, Rep. Jackson Lee has not carried her initial burden at summary judgment to demonstrate that Ms. Floyd's claim that she was not disabled for purposes of her 2011 tax return forecloses a finding that she is disabled under the ADA.  *Cf. Solomon v. Vilsack*, 628 F.3d 555, 561–65 (D.C. Cir. 2010) (holding that although employees who can perform the essential functions of their job with reasonable accommodations are ineligible for Federal Employees' Retirement System ("FERS") benefits, because the FERS application did not ask applicants whether they could do so, FERS applicants are not "presumptively barred" from bringing a failure-to-accommodate claim under the Rehabilitation Act, under which plaintiffs must be able to perform the essential functions of their job with reasonable accommodations (citing and discussing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999))).[32]

What remains, then, is Dr. Shultz's 1998 diagnosis, recorded on the California bar examination disability verification form, that Ms. Floyd's monocular vision "decreas[es] her speed of reading between 20–30 percent."  Cal. bar exam form 3, Def.'s Ex. 5.[33]  If viewed in the

---

[32] The *Solomon* court proceeded to a second factual inquiry: Although there is no presumption that bars FERS applicants from asserting Rehabilitation Act claims, the court asked whether the employee, "[t]o avoid summary judgment," could "reconcile this apparent discrepancy . . . ."  *Solomon*, 628 F.3d at 565.  Here, this Court need not reach this inquiry because Rep. Jackson Lee, by failing to explain the Internal Revenue Service's definition of "disability," has not presented any "apparent discrepancy" that Ms. Floyd would then have the burden to "reconcile."  *Id.*

[33] Ms. Floyd does not contend that the evidence of her having received accommodations in the past is sufficient to create a dispute of material fact, and even if she did, the Court would reject this argument.  On account of her impairment, Ms. Floyd requested and received accommodations when taking the California bar examination in 1998, Floyd Dep. at 230:10–15, when taking the Maryland bar examination in 2000, *id.* at 235:4–20, and while studying for a master's degree beginning in 2005, *id.* at 240:7–10; George Wash. Univ. letter of Sept. 19, 2005, Def.'s Ex. 6, ECF No. 53-5.  Past receipt of accommodations could indicate merely the accommodating entity's magnanimity, rather than the presence of an actual impairment that

light most favorable to Ms. Floyd, this diagnosis suffices to create a dispute of material fact as to whether her monocular vision substantially limits her ability to read because the "duration of time it takes [her] to perform the major life activity" of reading would, on average, be 20–30 percent longer than that required by the general population for any given reading task.  29 C.F.R. § 1630.2(j)(4)(i).

Rep. Jackson Lee offers a litany of reasons why Dr. Shultz's diagnosis is too unreliable to create a dispute of fact, but the Court rejects all of these arguments.  Rep. Jackson Lee first contends that because the form's second of three pages is missing, it cannot serve as competent evidence.  *See* Def.'s Mem. Supp. Mot. Summ. J. 17; *see also* Floyd Dep. at 162:14–21.  But the remaining pages sufficiently set forth Dr. Shultz's ultimate conclusion—that Ms. Floyd suffered from monocular vision, which decreased her reading speed by "between 20–30 percent."  Cal. bar exam form 3, Def.'s Ex. 5.  Rep. Jackson Lee next contends that Dr. Shultz's conclusion is not supported by any "testing documentation."  Def.'s Mem. Supp. Mot. Summ. J. 17.  But as explained above, "scientific, medical, or statistical analysis" is unnecessary for establishing a disability.  29 C.F.R. § 1630.2(j)(1)(v).  Rep. Jackson Lee then points to an internal inconsistency in the diagnosis—Dr. Shultz's equivocal conclusion on the form's first page that Ms. Floyd's impairment "*may* be impacting [her] ability to read fast."  Cal. bar exam form 1, Def.'s Ex. 5 (emphasis added); *see also* Def.'s Mem. Supp. Mot. Summ. J. 17.  While this slight inconsistency might give a jury pause, it does not make the diagnosis patently unreliable for

---

"substantially limits" a major life activity.  *See Steffen v. Donahoe*, 680 F.3d 738, 747 (7th Cir. 2012) ("The fact that [the plaintiff] previously received an accommodation . . . does not prove that [the employer representative] believed that he suffered a substantial limitation in a major life activity.").  Lastly, the Court notes that while it is not entirely clear from the record that Ms. Floyd actually *received* accommodations on the 1998 California bar examination (beyond merely requesting such accommodations), her deposition testimony implies that she did, and the Court assumes this to be so; in any case, this fact is immaterial.  *See* Floyd Dep. at 230:10–15.

summary judgment purposes. *Cf. Skelly v. Okaaloosaa Cnty. Bd. Of Cnty. Comm'rs*, 415 F.

App'x 153 (11th Cir. 2011) (unpublished) ("[T]his is . . . not a case in which the plaintiff's

testimony is so fantastic or internally inconsistent that no reasonable jury could credit it.").[34]

Rep. Jackson Lee further contends that Ms. Floyd "was evaluated . . . in the context of a timed

test, not employment." Def.'s Mem. Supp. Mot. Summ. J. 18. This argument, too, must fail; Dr.

Shultz opined on Ms. Floyd's reading speed as a general matter and did not limit his conclusion

to "the context of a timed test." *Id.* Rep. Jackson Lee further suggests that Dr. Shultz's

diagnosis is outdated, claiming that Ms. Floyd has no evidence of "any testing or the need for

accommodation during the time of her employment as Legislative Director/Chief Counsel."

Def.'s Mem. Supp. Mot. Summ. J. 18. But because Dr. Shultz found that Ms. Floyd's

impairment was "permanent," his findings are sufficient to support a finding that her ability to

read was limited to the same degree in 2010 as it was in 1998, when he completed the disability

verification form. Cal. bar exam form 1, Def.'s Ex. 5.

Rep. Jackson Lee's strongest challenge is that Dr. Shultz's assessment of Ms. Floyd's

reduced reading speed does not specify whether his baseline is "most people in the general

population," as required by the EEOC regulations. *See* Def.'s Mem. Supp. Mot. Summ. J. 17–

18; *see also* 29 C.F.R. § 1630.2(j)(1)(ii). Rep. Jackson Lee contends that Dr. Shultz's ambiguous

finding could be read to mean that Ms. Floyd's reading speed is 20 to 30 percent slower than

"people within her age group, students, he[r] [own reading speed] before she has read intensively

for several hours, or the general population." Def.'s Mem. Supp. Mot. Summ. J. 17 n.9.

---

[34] In fact, despite this inconsistency, the administrators of the California and Maryland
bar exams and George Washington University all granted Ms. Floyd accommodations on the
basis of Dr. Shultz's diagnosis. *See supra* note 33.

The Court disagrees.  First, Dr. Shultz's assessment was provided as the "[r]easons and basis" for his recommending that Ms. Floyd be allowed additional time on certain sections of the California bar examination—specifically, 60 additional minutes on the performance test, and 45 additional minutes on the multiple choice section.  *See* Cal. bar exam form 3, Def.'s Ex. 5.  This recommendation for additional time provides context that could allow a reasonable jury to find that the "baseline" for Dr. Shultz's assessment of Ms. Floyd's reduced reading speed was in fact the "general population."  Further context comes from Ms. Floyd's testimony: She testified in her deposition that when she met with Dr. Shultz, she explained her observation that she generally read more slowly than other people.  *See* Floyd Dep. at 168:5–17.  With this evidence, a reasonable jury could find that Dr. Shultz compared Ms. Floyd's reading speed to that of the "general population."  29 C.F.R. § 1630.2(j)(1)(ii).

Accordingly, the Court concludes that Dr. Shultz's 1998 diagnosis—and this evidence alone—creates a genuine dispute of material fact as to whether Ms. Floyd is an individual with a disability, on account of having a physical impairment that "substantially limits" her ability to read.  42 U.S.C. § 12102(1)(A).[35]

---

[35] In reply, Rep. Jackson Lee asserts, for the first time, that Ms. Floyd's medical evidence is inadmissible hearsay.  Specifically, Rep. Jackson Lee contends that the business records hearsay exception, Fed. R. Evid. 803(6), is inapplicable because the disability verification form has not been properly authenticated, and because Ms. Floyd's Rule 26(a) disclosure does not list any witness who can do so at trial.  *See* Def.'s Reply 3 & n.3 (citing Pl.'s Rule 26(a)(1) Statement, ECF No. 35).  New arguments asserted in reply are generally waived.  *See Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006).  In any event, the Court need not address this evidentiary question because, even assuming that the diagnosis is admissible and creates a dispute of material fact as to whether Ms. Floyd had a "disability" under the ADA, summary judgment would still be appropriate for reasons given below.  *See infra* Part IV.B.3, B.4.

## 2.  Notice

Rep. Jackson Lee next contends that summary judgment on the failure-to-accommodate claim is appropriate because there is no evidence that Ms. Floyd provided the office with any medical documentation substantiating her claim of disability.  *See* Def.'s Mem. Supp. Mot. Summ. J. 21–22.

The EEOC regulations provide that "[t]o determine the appropriate reasonable accommodation[,] it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.  This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3).  In short, the interactive process is a "flexible give-and-take" allowing the employer and employee to collaborate in "determin[ing] what accommodation would enable the employee to continue working."  *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (citation omitted).

The employer's duty to engage in the interactive process is "trigger[ed]" by the employee's initial provision of notice of her disability and request for accommodation.  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312–15 (3d Cir. 1999).  "[P]recise notice" of the employee's disability is unnecessary.  *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 898 (D.C. Cir. 1998) (finding notice insufficient to support failure-to-accommodate and discrete-act discrimination claims under Rehabilitation Act) (citation omitted).  The employee need not apprise the employer of "specifics," such as her impairment's name, diagnosis, or treatment.  *See Taylor*, 184 F.3d at 314.  Moreover, "requests for reasonable accommodations do not need to be in writing."  *Id.* at 313 (citation omitted); *accord Lee v. District of Columbia*, 920 F. Supp. 2d 127, 136 (D.D.C. 2013).  Nor do such requests need to "invoke the magic words 'reasonable

accommodation[.]'" *Taylor*, 184 F.3d at 313.  Rather, the individual need only provide an

"adequate, prior alert . . . of [her] disabled status" through either "actual or constructive" means.

*Crandall*, 146 F.3d at 898.[36]  Proper notice must simply enable the employer to "know of both

the disability and the employee's desire for accommodations for that disability." *Taylor*, 184

F.3d at 313; *accord Lee*, 920 F. Supp. 2d at 135–136.

 "An individual seeking accommodation need not provide medical evidence of her

condition in every case . . . [.]" *Ward*, 762 F.3d at 31.  "But when the need for an

accommodation is not obvious, an employer, before providing a reasonable accommodation, *may

require* that the individual with a disability provide documentation of the need for

accommodation." *Id.* (internal quotation marks, alterations, and citation omitted) (emphasis

added).  That is, "[o]nce the employer knows of the disability and the employee's desire for

accommodations, it makes sense to place the burden on the employer to request additional

information that the employer believes it needs" as part of the interactive process. *Taylor*, 184

F.3d at 315; *accord Lee*, 920 F. Supp. 2d at 136.  This burden recognizes that disabled

employees "may have good reasons for not wanting to reveal unnecessarily every detail of their

medical records because much of the information may be irrelevant to identifying and justifying

accommodations, could be embarrassing, and might actually exacerbate workplace prejudice."

---

  [36] Ms. Floyd does not contend that Rep. Jackson Lee had constructive notice of her
disability, and even if she had, the Court would conclude that the evidence cannot establish that
Ms. Floyd had any physical trait that was "so obviously a manifestation of an underlying
disability that it would be reasonable to infer that [Rep. Jackson Lee] actually knew of the
disability." *Crandall*, 146 F.3d at 898 (internal quotation marks, alterations, and citation
omitted).  *See* Floyd Dep. at 159:21–25 ("[I]f [someone looking at me] has knowledge of what
monocular vision is . . . and they look at me without my glasses, they might be able to tell that I
have monocular vision."); *id.* at 160:12–22 (testifying that at work, she wore glasses and
"contacts sometimes," and that with contacts, "you could tell that my eyes weren't together
sometimes"); *see also* Def.'s Mem. Supp. Mot. Summ. J. 22 n.13 (arguing that Ms. Floyd's
impairment was not "obvious" enough to support finding of constructive notice).

*Taylor*, 184 F.3d at 315.  Of course, if the employer, after receiving the initial notice of disability, makes a reasonable request for further documentation substantiating the disability or need for accommodation, then the employee must respond appropriately.  *See Ward*, 762 F.3d at 34–35 (holding that, where employee failed to provide documentation requested by employer, evidence could not support finding that employer refused an accommodation); *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308–309 (D.C. Cir. 2010) (same).

Here, the evidence could support a finding that Ms. Floyd provided adequate notice to her employer.  If the Court credits her testimony, as it must at summary judgment, her conversations with Mr. Buck, Mr. Thomas, and Rep. Jackson Lee each enabled the Representative's office to "know of both the disability and [her] desire for accommodations for that disability." *Taylor*, 184 F.3d at 313.  Ms. Floyd testified that when she was considering re-joining the office as Legislative Director and Chief Counsel, she told Mr. Buck of her "vision limitation" and "the fact that it takes [her] longer to read."  Floyd Dep. at 104:6–7.  She also claims that she told Mr. Buck that in light of her condition, she could accept the job only on specific conditions that would help her manage her workload.  *See id.* at 103:12–22.[37]  Later, when the Representative instructed Ms. Floyd not to delegate certain tasks, Ms. Floyd mentioned her "vision disability," her inability to use one eye, and her need for "more time" to complete the task.  *Id.* at 130:8–18.  Additionally, Ms. Floyd testified that she informed Mr. Thomas of her monocular vision, *see id.*

---

[37] Mr. Buck denies having been informed of Ms. Floyd's disability.  *See* Buck Dep. at 19:9–15.  But in ruling on a motion for summary judgment, this Court must view the evidence in the light most favorable to Ms. Floyd and refrain from making credibility determinations.  *See Czekalski*, 475 F.3d at 363.

at 145:8–146:9, and followed up with him on multiple occasions about the possibility of

receiving an accommodation, *see id.* at 147:11.[38]

This Court declines to require more "precise notice" than that provided by Ms. Floyd.

*See Crandall*, 146 F.3d at 898.  None of Ms. Floyd's communications with Mr. Buck, Mr.

Thomas, or Rep. Jackson Lee provided her impairment's name, diagnosis, or treatment, but such

detail is not required of an employee's initial notice.  *See Taylor*, 184 F.3d at 314; *see also Ward*,

762 F.3d at 31.  Likewise, Ms. Floyd's failures to submit "in writing" any notice of disability and

to "invoke the magic words 'reasonable accommodation'" are not fatal to her claim.  *Taylor*, 184

F.3d at 313.[39]  Lastly, and most relevant to Rep. Jackson Lee's submissions, the fact that medical

documentation did not accompany Ms. Floyd's initial requests for accommodation cannot

preclude a finding that her notice sufficed to trigger Rep. Jackson Lee's duty to engage in the

interactive process.  *See Taylor*, 184 F.3d at 313, 315.

Rep. Jackson Lee, however, invokes *Flemmings v. Howard University*, 198 F.3d 857

(D.C. Cir. 1999), for the proposition that an employer has no obligation to provide any

accommodation where "medical documentation" does not accompany the initial notice of

---

[38] Rep. Jackson Lee additionally contends that certain communications in 2006—the Congressional Black Caucus Foundation memorandum to the office concerning Ms. Floyd's disability and Ms. Floyd's discussions with Mr. Berry—cannot function as adequate notice, given that Ms. Floyd was not an employee during her time as a fellow, that the office never received any medical records, that two years then passed before Ms. Floyd was rehired as Legislative Director and Chief Counsel, and that her new position had "substantially different responsibilities" from her prior posts.  *See* Def.'s Mem. Supp. Mot. Summ. J. 21–22.  In her opposition, Ms. Floyd points to evidence suggesting that staffers' knowledge of her disability was conveyed to Rep. Jackson Lee in 2006 and, subsequently, to successor staffers.  *See* Pl.'s Mem. Opp'n 17–18.  Because the Court does not rely on these earlier communications, it need not address these arguments.

[39] Because there is no "magic words" requirement, the Court finds unhelpful Rep. Jackson Lee's attention to the facts that Ms. Floyd "did not use the word 'accommodation' in any of [her] conversations" with Mr. Buck, Def.'s Mem. Supp. Mot. Summ. J. 9, in her email to Rep. Jackson Lee, *id.* at 11, or in her discussions with Mr. Thomas, *id.* at 22.

disability and request for accommodation.  Def.'s Mem. Supp. Mot. Summ. J. 21 (citing

*Flemmings*, 198 F.3d at 861).  In that case, during the "relevant time period," Flemmings made

only one request for accommodation from her employer Howard University—a medical leave of

absence supported by a doctor's note, which her employer "readily granted."  *Flemmings*, 198

F.3d at 861–62.  Prior to this period, Flemmings's requests for a modified work schedule had not

been "substantiated" by "medical documentation."  *Id.* at 858, 861–62.  Accordingly, the court

rendered judgment for Howard on Flemmings's failure-to-accommodate claim, holding that

"there was no date for which Flemmings has offered evidence substantiating both an

accommodatable disability and a denial of accommodation."  *Id.* at 858.[40]

      This Court recognizes a potential tension between, on the one hand, *Flemmings* and, on

the other hand, the D.C. Circuit's prior decision in *Crandall*, which rejects a requirement that the

notice be "precise," and its more recent decisions of *Ward* and *Stewart*, which reason that

employees need not submit medical records unless subsequently requested in the interactive

process.  This Court will follow *Crandall*, *Ward*, and *Stewart*, which have neither been

withdrawn by those panels nor overruled by the court of appeals sitting *en banc*, *see Cobell v.

Salazar*, 816  F. Supp. 2d 10, 15 (D.D.C. 2011) (citing *Brewster v. C.I.R.*, 607 F.2d 1369, 1373

(D.C. Cir. 1979) (per curiam)), and whose reasoning finds broad support among other

authorities, *see Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003) (holding that where an

employee failed to produce "requested" medical documentation, the employer had no duty to

---

[40] Rep. Jackson Lee relies on *Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158 (D.D.C. 2002), and *Bramwell v. Blakey*, No. 04-927, 2006 WL 1442655 (D.D.C. May 24, 2006), for the proposition that an individual seeking a reasonable accommodation has the "burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination."  *Heasley*, 180 F. Supp. 2d at 167 (internal quotation marks and citation omitted); *see also* Def.'s Mem. Supp. Mot. Summ. J. 21.  But the Court is not persuaded by these cases because they both rely in part on *Flemmings*, which this Court declines to follow, as explained above.

engage in "further interactive processes" with respect to the specific accommodation sought, but still had a duty to engage in the interactive process "to consider whether an alternative accommodation . . . would be possible"); *Gard v. U.S. Dep't of Educ.*, 691 F. Supp. 2d 93, 100 (D.D.C. 2010) ("An employee seeking an accommodation for a disability must comply with an employer's *reasonable request for* medical documentation." (emphasis added)), *aff'd*, No. 11-5020, 2011 WL 2148585 (D.C. Cir. May 25, 2011); Policy Guidance on Executive Order 13164: Establishing Procedures to Facilitate the Provision of Reasonable Accommodation, 2000 WL 33407185, at *10.[41]

The Court therefore concludes that a genuine dispute of material fact exists as to whether Ms. Floyd provided adequate notice of her disability and requested a reasonable accommodation.

### 3. Qualified Individual

Rep. Jackson Lee argues that the summary judgment record cannot support a finding that Ms. Floyd is a "qualified individual" for purposes of her failure-to-accommodate claim—that is, that she could perform her essential job functions with reasonable accommodation. *See Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002) ("[A]n individual with a disability is 'qualified' if he or she can perform the essential functions of the position with a reasonable accommodation."); *Solomon*, 763 F.3d at 9; Def.'s Mem. Supp. Mot. Summ. J. 23–27.

Preliminarily, the Court notes that it need not decide whether the record could support a finding that Ms. Floyd could perform her essential duties *without* reasonable accommodation.

---

[41] This Policy Guidance helps federal agencies implement the Rehabilitation Act's mandate to provide reasonable accommodation to their employees: "[W]hen a disability and/or need for accommodation is not obvious, the agency *may, if it chooses, require* that the individual provide reasonable documentation about the disability and his/her functional limitations. . . . The agency is not *required* to request documentation in such cases; the agency's procedures should, however, explain that failure to provide necessary documentation *where it has been properly requested* could result in a denial of reasonable accommodation."  Policy Guidance on Executive Order 13164, 2000 WL 33407185, at *10 (emphasis added).

To be sure, the ADA defines "qualified individual" as one who can perform her essential duties "with *or without* reasonable accommodation." 42 U.S.C. § 12111(8) (emphasis added). If a disabled employee "can perform [her essential] functions *without* reasonable accommodation, so much the better—she is, of course, still qualified." *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994); *see also Solomon*, 763 F.3d at 9. At summary judgment, however, Ms. Floyd argues only that she could fulfill her essential duties *with* a reasonable accommodation, not *without* such accommodation; the Court's inquiry is accordingly limited to her argument. *See* Pl's Mem. Opp'n 26–28, ECF No. 56; *cf. Carr*, 23 F.3d at 529 (explaining that because the plaintiff "concedes that without some form of accommodation she cannot perform the essential functions of her job," the court need only "ask simply whether any reasonable accommodation would have allowed [the plaintiff] to perform all the essential functions of her job").[42]

If an individual with a disability cannot perform the "essential functions" of her job even with reasonable accommodation, then the employer has no duty to provide such accommodation. *See Carr*, 23 F.3d at 529–30 (affirming grant of summary judgment to employer where individual required to meet daily 4:00 PM document-processing deadline sought flexible working hours as accommodation). The EEOC regulations define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). What constitutes "essential functions" in a particular case is a "question of fact." *Floyd*, 968 F. Supp. 2d at 327 (citing *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1005 (6th Cir. 2005)). Employers enjoy "substantial deference" in defining

---

[42] The evidence suggests that Ms. Floyd at least subjectively *believed* that she could not perform her essential duties without accommodation, given her requests for workload reductions and ultimate resignation. On the other hand, the record is silent as to the office's assessment of Ms. Floyd's ability to perform her essential duties, and there is no evidence that headaches or eyestrain caused by failing to take breaks during intensive reading resulted in a decline in performance.

essential functions, *McNair v. District of Columbia*, 11 F. Supp. 3d 10, 15 (D.D.C. 2014),

because evidence of such functions can include the "employer's judgment," "[w]ritten job

descriptions prepared before advertising or interviewing applicants for the job," the

"consequences of not requiring the incumbent to perform the function," and the "work

experience of past incumbents in the job," 29 C.F.R. § 1630.2(n)(3).

Ms. Floyd initially requested of Mr. Buck that the office hire an additional Legislative

Assistant and that she be relieved of primary responsibility for issue areas assigned to other

staffers and for events occurring in Houston.  *See* Floyd Dep. at 107:18–110:16, 112:14–117:15.

In her motion, Rep. Jackson Lee contends that the evidence cannot show that there existed any

"accommodation [that] would have enabled her to perform the essential functions of the job."

*See* Def.'s Mem. Supp. Mot. Summ. J. 26–27.

The Court agrees with Rep. Jackson Lee that hiring an additional Legislative Assistant to

help Ms. Floyd complete her work would not constitute a "reasonable" accommodation.  *See*

*Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (finding "unreasonable" an

accommodation that would "requir[e] another person to perform an essential function" of the

disabled employee's job); *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 (8th Cir. 2001)

("[A]n employer is not required to hire additional employees or assign those tasks that the

employee could not perform to other employees."); *Patton v. Dobson Ass'n*, 113 F.3d 1242,

1997 WL 218587, at *1 (9th Cir. 1997) (unpublished) ("Restructuring an existing job can be a

reasonable accommodation under the ADA, but an employer is not required to hire additional

employees or make fundamental modifications in its operations." (internal citation omitted)); *see*

*also* 29 C.F.R. §1630.2(o), App. (explaining that an employer is not required to hire an "assistant . . . [to] perfor[m] the job for the individual with a disability").[43]

As for Ms. Floyd's other initial requests, there is at best a very weak dispute of fact as to whether the requests identified reasonable accommodations that would have enabled her to perform her essential duties.  Ms. Floyd seems to admit that Houston district-related duties were essential, based on her testimony regarding "nonlegislative" duties of past Legislative Directors, *see* Floyd Dep. at 85:19–21, and the inclusion of such duties in her job description, *see* Duties and Responsibilities, Def.'s Ex. 15, ECF No. 53-5; Floyd Dep. at 75:17–77:23.  In support of her judgment that work related to Houston events was nonessential, she has proffered no documents, *see* Floyd Dep. at 117:16–18, but only vague references in her deposition to her understanding of the "scope of the position," "priorities in the office," and "past practices of the office," *id.* at 116:16–117:15; *see also Greene*, 164 F.3d at 675 (explaining that "conclusory" assertion in affidavit did not establish a genuine issue for trial).  Whether delegation of certain legislative work would have precluded her from performing her essential duties is a somewhat closer question.  On the one hand, the Legislative Director job description expressly mentions the authority to delegate and assign work.  *See* Duties and Responsibilities, Def.'s Ex. 15 (providing that Legislative Assistants may handle legislative work "as assigned by" the Legislative Director).  On the other hand, Ms. Floyd conceded in her deposition that Rep. Jackson Lee at

---

[43] Other courts have treated the hiring of an additional employee as an undue hardship, but Rep. Jackson Lee does not assert this defense.  *See, e.g.*, *Mulloy v. Acushnet Co.*, 460 F.3d 141, 146 (1st Cir. 2006).  There is, however, "much overlap" and "interrelat[ion]" between the inquiries into a "reasonable" accommodation and "undue hardship."  *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 314 (4th Cir. 2008).

times asked expressly for specific work to be completed by Mr. Berry when he served as

Legislative Director.  *See* Floyd Dep. at 84:9–22.

In any event, the Court need not decide whether these accommodations could enable Ms.

Floyd to perform her essential duties because she has conceded that they could not.  In her

opposition, Ms. Floyd emphasizes that her initial requests of Mr. Buck—for the additional

Legislative Assistant, the authority to delegate legislative work, and relief from Houston-related

assignments—were merely "*requests* for accommodations" and acknowledges that "[a]n

employer is not obligated to provide an employee with the exact accommodation(s) requested."

Pl.'s Mem. Opp'n 27.  In light of Ms. Floyd's failure to respond, the Court will deem conceded

Rep. Jackson Lee's argument that these particular accommodations would have excused her

from performing essential job duties.  *See Hopkins v. Women's Div., Gen. Bd. of Global*

*Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, a court may

treat those arguments that the plaintiff failed to address as conceded.").

Instead, in her opposition, Ms. Floyd advances three arguments as to why she was a

qualified individual.  The Court, however, finds each argument to be meritless.  First, Ms. Floyd

contends that at summary judgment, Rep. Jackson Lee is precluded from arguing that she was

not a qualified individual "because no one from the Office ever engaged with Plaintiff to

determine what an effective yet reasonable accommodation might be."  Pl.'s Mem. Opp'n 26.

But the Court's previous opinion in this case squarely rejected this position as a matter of law:

Because there is no independent liability for failure to engage in the interactive process, at

summary judgment, Ms. Floyd must proffer evidence that she was a qualified individual, as the

ADA's text requires—*i.e.*, that she could have performed her essential duties with a reasonable

accommodation. *Floyd*, 968 F. Supp. 2d at 327 ("Ms. Floyd will not be able to prevail on her

failure to accommodate claim merely by showing (as she argues here) that the Representative

refused to discuss potential accommodations . . . ."); *see also* 42 U.S.C. § 12112(b)(5)(A)

(imposing liability for denial of accommodation to "qualified individual with a disability").[44]

Ms. Floyd also claims that, after her resignation, Rep. Jackson Lee's willingness to

discuss accommodations and to bring her back to work shows that she was a qualified individual.

*See* Jackson Lee Dep. at 101:8–10; Pl.'s Mem. Opp'n 28 ("Defendant's argument that Plaintiff

was not qualified to perform the essential functions of her position . . . is completely

incompatible with its stated efforts to retain her in the position."). But if an employer's interest

in negotiating with or retaining a disabled employee could establish "qualified individual" status,

employers would be loath to negotiate at all for fear of foreclosing a potential defense, even

where the employee could not in fact perform her essential job functions with any reasonable

accommodation. *Cf.* Fed. R. Evid. 408(a)(2) (rendering inadmissible for purposes of proving a

claim any "conduct or a statement made during compromise negotiations about the claim"). To

avoid undermining the interactive process, the Court concludes that evidence of Rep. Jackson

---

[44] The D.C. Circuit, like other courts of appeals, has not recognized an independent cause of action for failure to engage in the interactive process in the absence of evidence that the plaintiff was a "qualified individual." *See* John R. Autry, Reasonable Accommodation Under the ADA: Are Employers Required to Participate in the Interactive Process? The Courts Say "Yes" But the Law Says "No," 79 Chi.-Kent L. Rev. 665, 687–89 (2004) (explaining that there is no standalone liability for failure to participate in the interactive process because even where courts of appeals have foreclosed summary judgment for an employer's failure to participate in the interactive process, the courts have still required a showing of "qualified individual" status); 1 Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 13-164–13-165 (5th ed. 2012) ("Although most courts hold that an employer's failure to engage in the interactive process is not an independent legal violation, it may be evidence of a failure to accommodate." (reviewing cases in accompanying footnotes)).

Lee's interest in negotiating with Ms. Floyd cannot suffice to establish that she was a qualified individual.[45]

Ms. Floyd's final argument is that she could have performed her essential job functions with the reasonable accommodation of "taking rest breaks."  *See* Pl.'s Mem. Opp'n 27. Although Ms. Floyd does not elaborate, the Court assumes that "rest breaks" refers to the ten-minute rest breaks that she took for every three hours of intensive reading when she previously worked in the office.  *See* Floyd Dep. at 64:4–20, 65:3–6.  The Court, however, reading Ms. Floyd's opposition together with her deposition testimony, understands that in practice, this requested accommodation consists not of rest breaks alone, but a *reduction in workload* that would enable those breaks.  *See* Def.'s Reply 12 (explaining that ten-minute rest break is "not the same thing as" reduced workload enabling rest breaks).  Indeed, Ms. Floyd conceded as much in her deposition:

> [W]hat would allow for me to actually take breaks is if all this work from the district, from the fact that we're understaffed, from the fact that I'm getting issues where other staffers were assigned, that's where—that's what prevents the breaks from happening, is the additional work.

Floyd Dep. at 138:2–9.  Accordingly, Ms. Floyd's own testimony establishes that although she had the actual ability to take rest breaks, *see infra* Part IV.B.4, she could not do so without relief from certain "additional work."  And, crucially, this "additional" work is precisely what she has now conceded was essential to her role, as explained above.  Nor can Ms. Floyd rely on Mr. Berry's vague testimony that he "take[s] breaks" as evidence that she, too, could have taken rest breaks while fulfilling her essential duties.  Berry Dep. at 156:10–11; *see also* Pl.'s Mem. Opp'n 27 n.3.  Mr. Berry's testimony did not specify the frequency or length of his breaks, and Ms.

---

[45] *Cf. supra* note 33 (explaining that past receipt of voluntary accommodations, standing alone, does not establish that an individual has a "disability" under the ADA).

Floyd needs ten minutes of rest for every three hours of intensive reading.  Even if Mr. Berry's rest breaks were akin to what Ms. Floyd needed, pointing to his ability to take breaks gets her nowhere because she has testified that her *workload*, rather than any office policy or practice, prevented her from taking breaks.  *See infra* Part IV.B.4 (explaining that Ms. Floyd, like Mr. Berry, had authority to take rest breaks).  In sum, Ms. Floyd cannot in her opposition reframe her requests to be relieved of essential duties as a request for the mere ability to take rest breaks, when undisputed evidence shows that she could not have taken breaks without also obtaining relief from her essential duties.[46]

As this Court noted in its prior opinion, one basis for granting summary judgment would be undisputed record evidence that "working longer and harder than [Ms. Floyd] was able to do was an essential function" of her role.  *Floyd*, 968 F. Supp. 2d at 327.  The record reveals precisely such evidence: The only accommodations that Ms. Floyd has identified would have reduced her workload, and she concedes that these reductions would have relieved her of essential functions.  Accordingly, a reasonable jury could not find that Ms. Floyd could perform her essential duties even with the benefit of a reasonable accommodation, and she has failed to create a genuine dispute of fact as to whether she was a "qualified individual."

---

[46] To be sure, Ms. Floyd is not bound in litigation by an initial (or any prior) request for reasonable accommodation.  The test, rather, is whether Ms. Floyd could perform the essential functions of the Legislative Director and Chief Counsel role "with . . . reasonable accommodation"; a plaintiff need not identify a specific reasonable accommodation when making initial requests of her employer.  *Solomon*, 763 F.3d at 9; *see also Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007) ("[W]e must ask simply whether *any* reasonable accommodation would have allowed [the plaintiff] to perform all the essential functions of [his] job without creating an undue hardship for the agency." (internal quotation marks and citation omitted) (emphasis added)).  Nonetheless, in litigation, Ms. Floyd must proffer evidence that there existed some reasonable accommodation that would have made her a "qualified individual," and based on the summary judgment record, the Court here concludes that rest breaks alone, without relief from essential duties, would not have sufficed as that reasonable accommodation.

### 4. Refusal to Provide Accommodation

Even assuming *arguendo* that taking ten-minute rest breaks for every three hours of intensive reading is actually what Ms. Floyd now contends would have been a reasonable accommodation, and that these breaks would have been fully compatible with her essential duties, thus rendering her a "qualified individual," the Court concludes that the evidence cannot support a finding that Ms. Floyd was ever denied this accommodation. *See* Def.'s Mem. Supp. Mot. Summ. J. 26.[47]  As Rep. Jackson Lee explains, the undisputed evidence shows that Ms. Floyd "could have taken breaks whenever she felt it was necessary." Def.'s Reply 13.

As a factual matter, the summary judgment record, even viewed in the light most favorable to Ms. Floyd, could not support a finding that the office denied her ten-minute rest breaks. *See Anderson*, 477 U.S. at 255. Two portions of Ms. Floyd's deposition testimony come close, but ultimately fall short of establishing such a denial.

First, Ms. Floyd testified that on April 26, 2010, when she first directly informed Rep. Jackson Lee of her monocular vision and sought to delegate certain work to a Legislative Assistant, Ms. Floyd mentioned her need for "time to take a break." Floyd Dep. at 130:17–18. In response, by Ms. Floyd's account, Rep. Jackson Lee told her that she could not delegate the assignment, and that she should not take "take ten years to get it done." *Id.* at 130:19–23. Apparently, Ms. Floyd construed the "ten years" comment to be a blanket prohibition on taking any rest breaks. *Id.* at 139:22–25.[48]  At summary judgment, "all *justifiable* inferences are to be drawn" in Ms. Floyd's favor, *Anderson*, 477 U.S. at 255 (emphasis added), but the inference that

---

[47] Although this argument is partially located in Rep. Jackson Lee's discussion of whether Ms. Floyd was a "qualified individual," the Court will address it in this section given its relevance. *See* Def.'s Mem. Supp. Mot. Summ. J. 26.

[48] On this point, the excerpt of Ms. Floyd's deposition ends mid-sentence, but the Court infers Ms. Floyd's contention from the continuing discussion one page later about the "ten years" comments. *See* Floyd Dep. at 141.

Rep. Jackson Lee's instruction not to take "ten years" on an assignment amounted to a prohibition on ten-minute rest breaks is not justifiable.[49]

Second, Ms. Floyd testified that even if she had permission to take rest breaks, constant assignments and requests from Rep. Jackson Lee forced her to read and write "continuously" for longer than three hours at a time, thereby depriving her of rest breaks as a practical matter. Floyd Dep. at 136:2–139:18. Although this testimony could support a finding that Ms. Floyd had to manage a significant workload, once again, it cannot support a finding that the office prevented her from taking ten-minute rest breaks. Ms. Floyd proffers no evidence that when Rep. Jackson Lee gave her new assignments, she instructed her not to take rest breaks. Moreover, the parties do not dispute that there was "no gate at the door" regulating employee breaks. *See* Jackson Lee Dep. at 72:8; *see also id.* at 73:1–2 ("[N]o one would block anyone from taking breaks."). Nor was the Representative personally preventing rest breaks; to the contrary, she spent a significant amount of time in hearings, on the House floor, and in her district. *See* Jackson Lee Dep. at 133:4–12 (legislative sessions on House floor); Berry Dep. at 73:2–4 (committee hearings); Floyd Dep. at 135:8–23 (time in district). Moreover, Ms. Floyd does not dispute evidence that the current Legislative Director and Chief Counsel, Mr. Berry, regularly takes breaks, *see* Berry Dep. at 156:8–157:3,[50] and her testimony that she regularly took breaks in her prior positions is further evidence that the heavier workload of the Legislative Director and Chief Counsel was what prevented her from taking breaks, not a change in office

---

[49] The Court reaches the same conclusion with respect to all of the "many times" in which Rep. Jackson Lee told Ms. Floyd not to take "ten years" on various new assignments, according to the latter's deposition testimony. *See* Floyd Dep. at 171:19–172:16.

[50] Rather than dispute evidence of Mr. Berry's rest breaks, Ms. Floyd cites this evidence for the inference that she was a "qualified individual" because she, too, could have completed her essential duties with ten-minute rest breaks for every three hours of intensive reading. As explained above, however, the Court rejects this inference. *See supra* Part IV.B.3.

policy, *see* Floyd Dep. at 64:4–20, 65:3–6.  Lastly, there is no evidence that deadlines for

assignments requiring intensive reading were so aggressive that a ten-minute break would have

made the difference between timely and tardy completion; even twelve hours of continuous,

intensive reading (which Ms. Floyd does not allege that she regularly needed to do) would

translate into merely forty minutes of rest breaks.  *See* Floyd Dep. at 136:11–15, 137:20–22,

139:8–18 (explaining that she often needed to read continuously for more than three hours

without resting).  Once again, the inference that Ms. Floyd was denied the ability to take ten-

minute rest breaks for every three hours of intensive reading is not "justifiable."  *Anderson*, 477

U.S. at 255.

In her opposition, however, Ms. Floyd eschews factual arguments.  Instead, echoing her

argument that she must be presumed a qualified individual at summary judgment, she seems to

contend that as a matter of law, the office's failure to participate in the interactive process

constitutes a constructive denial of rest breaks.  In her view, her employer "can be held liable

under the ADA not only for denying [her] the requested accommodations, but for failing to

engage in the interactive process altogether . . . ."  Pl.'s Mem. Opp'n 27–28.  But she cannot

assert a constructive denial where, as a factual matter, she had ready authority to take rest breaks

as necessary.[51]  *See Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 92 (1934) ("[L]egal

---

[51] To be sure, the Court has already found that Ms. Floyd's notice was adequate to trigger
the office's "duty" to participate in the interactive process.  *See supra* Part IV.B.2.  But the
Court's notice analysis is founded on the premise that the requested accommodation is not
already available (as any "notice" analysis must imply).  *Cf. Ward*, 762 F.3d at 31 ("[A]n
employer needs information about the nature of the individual's disability and the *desired*
accommodation." (emphasis added)).  Rep. Jackson Lee had a duty to interact with Ms. Floyd as
to the initial requests to hire a Legislative Assistant and reduce her workload, but Ms. Floyd now
concedes that those requests were unreasonable, and there is no independent cause of action for
failure to interact.  *See supra* note 44.  With respect, however, to rest breaks standing alone
(assumed *arguendo* in this section to be a reasonable accommodation for "qualified individual"
status), the Court concludes that Rep. Jackson Lee had *no duty* to interact at all, given that rest

fictions have an appropriate place in the administration of the law when they are required by the demands of convenience and justice."); *Pettibone Corp. v. Easley*, 935 F.2d 120, 123 (7th Cir. 1991) ("Even legal fictions have their limits.").  And to the extent that Ms. Floyd contends that a failure to participate in the interactive process is independently actionable under the ADA, she would be mistaken.  *See supra* note 44.  In short, summary judgment evidence that a disabled employee had ready access to a requested reasonable accommodation precludes a reasonable jury from finding that the employer denied that particular accommodation.

*     *     *

At bottom, Ms. Floyd's problem was not an inability to take ten-minute rest breaks, but an inability to manage the demanding workload of her new role as Legislative Director and Chief Counsel.  Because a reasonable jury could not conclude from the summary judgment record either that Ms. Floyd was a qualified individual or that she was denied the reasonable accommodation of taking ten-minute rest breaks for every three hours of intensive reading, the Court grants Rep. Jackson Lee's motion for summary judgment as to the failure-to-accommodate claim.

### C.  Hostile Work Environment

The amended complaint alleges that Rep. Jackson Lee's "continual refusal to engage in a discussion to determine a reasonable accommodation" and "frequent humiliating and derogatory

---

breaks were already available to Ms. Floyd.  *Cf. Ward*, 762 F.3d at 32 (explaining that, in case where plaintiff *did not have access* to the requested accommodation, "to establish that her request [for accommodation] was 'denied,' [the plaintiff] must show either that [the defendant] in fact ended the interactive process or that it participated in the process in bad faith"); *see also* Autry, Reasonable Accommodation Under the ADA, at 690 ("The key to liability, then, is the defendant's failure to implement one of the available appropriate accommodations, *not* the failure to interact with the plaintiff." (reviewing cases)); *id.* at 691 ("There is, then, no situation (and no circuit) in which an employer is *required* by law to engage in the interactive process. Liability attaches under the ADA if the employer fails to reasonably accommodate the limitations of an employee's disability.").

comments about her disability" amounted to a hostile work environment, in violation of the

Congressional Accountability Act.  Am. Compl. 10.[52]  In her motion for summary judgment,

Rep. Jackson Lee argues that the evidence at most shows that Ms. Floyd suffered the

"tribulations of a fast-paced, demanding congressional workplace," not a hostile work

environment actionable as harassment affecting a term, condition, or privilege of her

employment.  Def.'s Mem. Supp. Mot. Summ. J. 30.  For the reasons given below, the Court

agrees.[53]

As incorporated by the Congressional Accountability Act, the ADA provides that "[n]o

covered entity shall discriminate against a qualified individual on the basis of disability in regard

to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and *other terms, conditions, and privileges of employment*."  42

U.S.C. § 12112(a) (emphasis added).  Because the Supreme Court has held that similar language

in Title VII establishes a cause of action for hostile work environment harassment, courts have

---

[52] In its enumerated causes of action, the amended complaint formally asserts only a *retaliatory* hostile work environment claim, rather than a standalone hostile work environment claim.  But the Office addressed a standalone claim in its prior motion to dismiss, and because Ms. Floyd filed her amended complaint while proceeding *pro se*, this Court construed her pleading liberally to assert such a claim and concluded that it survived Rep. Jackson Lee's previous motion to dismiss.  *See* Mem. Supp. Def.'s Mot. Dismiss 46–56, ECF No. 22-1; *Floyd*, 968 F. Supp. 2d at 328–30.

[53] Rep. Jackson Lee argues that, alternatively, Ms. Floyd is not disabled under the ADA. Because the Court has already concluded to the contrary, it need not address the issue further here.  *See supra* Part IV.B.1.

In reply, Rep. Jackson Lee also contends that Ms. Floyd has conceded that summary judgment is proper on her work environment claim given her failure to respond in her opposition to arguments made in the motion for summary judgment.  *See* Def.'s Reply 14; *see also Hopkins*, 284 F. Supp. 2d at 25.  Ms. Floyd has not conceded Rep. Jackson Lee's arguments; she contends that there are genuine disputes of fact concerning her "claim of a hostile work environment on the basis of her disability."  *See* Pl.'s Mem. Opp'n 20.  The Court recognizes, however, that Ms. Floyd's decision to present this discussion in a prefatory section entitled "Genuine Disputes of Material Fact Not Addressed by Defendant," rather than in the body of her argument, is confusing.

held that a hostile work environment claim is also cognizable under the ADA.  *See, e.g.*, *Lanman v. Johnson Cnty., Kansas*, 393 F.3d 1151, 1155–56 (10th Cir. 2004); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719–20 (8th Cir. 2003); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 232–35 (5th Cir. 2001).  A plaintiff asserting a hostile work environment claim under the ADA must establish these elements of a prima facie case: "(1) she is disabled or is perceived as disabled; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her disability or the perception that she was disabled; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for holding the employer liable for the creation of the hostile work environment."  *Floyd*, 968 F. Supp. 2d at 328 (citations omitted).

To establish that the harassment "affected a term, condition, or privilege of employment" under the fourth prima facie case element, a plaintiff must show that her "workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir. 2013) (citation omitted); *accord Floyd*, 968 F. Supp. 2d at 329.  Moreover, the offending conduct must satisfy both objective and subjective standards of hostility: That is, it must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive," and cause the "victim . . . subjectively [to] perceive the environment to be abusive."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (articulating test of Title VII hostile work environment); *accord Brown v. Snow*, 407 F. Supp. 2d 61, 69–70 (D.D.C. 2005) (applying *Harris* to ADA hostile work environment claim).  "[O]bjective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Oncale v. Sundowner*

*Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks and citation omitted).

"This objective test requires examination of the totality of the circumstances, including 'the

frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance.'" *Whorton v. Wash. Metro. Area Transit Auth.*, 924 F.

Supp. 2d 334, 353 (D.D.C. 2013) (quoting *Harris*, 510 U.S. at 23). "[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S.

775, 788 (1998) (internal quotation marks and citation omitted).

The prolonged denial of a reasonable accommodation can underlie a hostile work

environment claim when "all the circumstances" would support such a claim. *Oncale*, 523 U.S.

at 81 (internal quotation marks omitted). That is, when making a hostile work environment

determination, the jury can weigh a wrongful denial of accommodation alongside evidence of

other harassment, and that other evidence can augment the weight of the denial by suggesting

discriminatory animus.[54] *See Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir.

1997) (explaining in dicta that a hostile work environment under the ADA could result from an

injurious denial of a requested accommodation); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 173,

---

[54] To be sure, the mere denial of a requested accommodation, with nothing more, will not
rise to the level of a hostile work environment. *See, e.g.*, *Blundell-Zuker v. Oakland Cnty. Prob.
Ct.*, 9 F. App'x 318, 319 (6th Cir. 2001) (unpublished) (holding that evidence of two meetings
where employee "was told that she could not be accommodated and then offered [a] transfer"
were "insufficient to establish the kind of severe and pervasive mistreatment necessary to state a
hostile environment claim"); *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1247 (D.C.
2009) ("The mere fact that Ms. Carter indicated that Covington would not accommodate
appellant with a 30–hour work week . . . , does not transform a failure to accommodate claim
into a hostile work environment claim."). That is, a failure-to-accommodate claim cannot fully
merge with a hostile work environment claim because "a plaintiff may not combine discrete acts
to form a hostile work environment claim without meeting the required hostile work
environment standard . . . ." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

179 (4th Cir. 2001) (holding that employer's intentional refusal to accommodate employee's disability and forcing him to "perform tasks beyond his medical restrictions," coupled with evidence of "constan[t]" verbal harassment and ostracizing targeting his disability, could support a finding of a hostile work environment); *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 71 (D.D.C. 2005) (holding that evidence that "the agency frustrated [the employee's] efforts to secure the reasonable accommodations he was entitled to by law," that agency officials made statements "suggest[ing] a discriminatory purpose," and that the employee endured "unreasonably lengthy delays" precluded summary judgment on a hostile work environment claim).

Here, if there were evidence that Ms. Floyd was a qualified individual and that she had been denied rest breaks, thereby allowing her failure-to-accommodate claim to survive summary judgment, the factual circumstances of that claim might, though perhaps just barely, support a jury finding of a hostile work environment—one centered on a denial of reasonable accommodation and related verbal harassment.  By this logic, the unlawful seven-month denial of accommodation would be the necessary (though not sufficient) ingredient in Ms. Floyd's hostile work environment claim—the core of the "pervasive" hostility that she experienced, *Harris*, 510 U.S. at 21, which in turn would lend context to her other evidence of verbal harassment, viewed in the light most favorable to her, *see Fox*, 247 F.3d at 173, 179 (describing work forcing employee to exceed medical restrictions for back injury coupled with constant verbal harassment); *Pantazes*, 366 F. Supp. 2d at 61–64, 71 (describing over two years of "unreasonably lengthy delays" and statements "suggest[ing] a discriminatory purpose").[55]

---

[55] Rep. Jackson Lee limits her analysis of the hostile work environment claim to incidents of verbal harassment.  *See* Def.'s Mem. Supp. Summ. J. 28–32 (focusing only on verbal harassment).  But Ms. Floyd's hostile work environment claim rests on more than verbal harassment alone.  The amended complaint asserts that "[i]n addition [to Rep. Jackson Lee's verbal insults], working without a reasonable accommodation . . . caused Ms. Floyd severe

But because the Court grants summary judgment on Ms. Floyd's failure-to-accommodate claim, *see supra* Part IV.B, she cannot rely on the denial of accommodation to support her hostile work environment claim.  Put differently, if a plaintiff could not prevail on a standalone failure-to-accommodate claim, the same alleged lack of accommodation could not constitute "severe or pervasive" harassment for purposes of a hostile work environment claim.  *Grosdidier*, 709 F.3d at 24 (describing features of hostile work environment harassment); *cf. Marshall*, 130 F.3d at 1099 (explaining that even if the plaintiff had advanced a hostile work environment claim on the basis of denied accommodation, "it remains the case that her disability (if any) created no occasion for accommodation in that job"); *Pantazes*, 366 F. Supp. 2d at 71 ("[A] jury could conclude that the agency frustrated plaintiff's efforts to secure the reasonable accommodations *he was entitled to by law . . . .*" (emphasis added)).  Accordingly, Ms. Floyd cannot base her hostile work environment claim on evidence of a wrongful denial of accommodation.

With the denial of accommodation out of the picture, what remains for purposes of Ms. Floyd's hostile work environment claim is her evidence of verbal harassment.  Ms. Floyd testified in her deposition that Rep. Jackson Lee, when personally denying her accommodation requests on two separate occasions, stated that she "didn't care" and "didn't give a damn"[56]

---

mental and physical fatigue, eye strain, and headaches."  Am. Compl. 20; *see also id.* 16, 18 (alleging that office's refusal to provide or even discuss accommodations was "intolerable"); *see also* Floyd Dep. at 173:5–12 (same); *see* Pl.'s Mem. Opp'n 20 ("Plaintiff's claim of a hostile work environment is based, *in part*, on comments made by the Congresswoman regarding her disability." (emphasis added)).

[56] The Court rejects Rep. Jackson Lee's argument that the alleged statement that she "didn't give a damn" about Ms. Floyd's disability, relayed through Mr. Thomas, is inadmissible hearsay.  *See* Def.'s Mem. Supp. Mot. Summ. J. 30.  At the outset, Rep. Jackson Lee argues that Ms. Floyd conceded this evidentiary point in her deposition by explaining that she could "only go on" Mr. Thomas's recounting because she "wasn't there at the time of their conversation."  Floyd Dep. at 170:18–19.  The Court finds no such concession on account of Ms. Floyd's deposition testimony, which simply explained the factual circumstances of the statement and expressed no opinion on whether it constituted hearsay as a matter of law.  Turning to the

about Ms. Floyd's disability in April 2010 and August 2010, respectively.  Floyd Dep. at

130:19–23, 148:22–24.[57]  Additionally, over the course of her seven-month tenure, Ms. Floyd

was told "many times" (at least "more than five" times) when receiving new assignments from

Rep. Jackson Lee that she should not take "ten years" to complete her work, Floyd Dep. at

171:19–172:16, and Rep. Jackson Lee had knowledge of Ms. Floyd's monocular vision when

making these remarks, *see id.* at 141:9–17; *supra* note 6.[58]  But Rep. Jackson Lee's remarks,

even inferred to be crude attacks on Ms. Floyd's disability, are insufficiently "severe or

pervasive" to sustain her hostile work environment claim.  *Grosdidier*, 709 F.3d at 24; *see also*

*Faragher*, 524 U.S. at 788 (explaining that "simple teasing, offhand comments, and isolated

incidents (unless extremely serious)" do not constitute a hostile work environment); *George v.*

---

substance of the hearsay challenge, the Court first finds that Mr. Thomas's recounting is admissible as a statement of an agent of a party-opponent; as the office's Chief of Staff, he was relaying the Representative's response to an employee's inquiry about a work-related matter. *See* Fed. R. Evid. 801(d)(2)(D).  Rep. Jackson Lee's statement, in turn, is admissible either on the same grounds (she is also an agent of her office, though perhaps the most important agent), *see id.* 801(d)(2), or because it is not hearsay at all—for Ms. Floyd seeks not to prove the "truth of the matter asserted" (*i.e.*, that Rep. Jackson Lee *actually* "didn't give a damn") but only that such a remark was made with discriminatory intent, *see id.* 801(c)(2).

[57] Rep. Jackson Lee in passing argues that the evidence shows no causal link between any verbal harassment and Ms. Floyd's disability.  *See* Def.'s Mem. Supp. Mot. Summ. J. 30; *see also Floyd*, 968 F. Supp. 2d at 328 (requiring causation).  Although a scrupulous reader could glean from these comments that Rep. Jackson Lee meant literally that she "didn't care" (*i.e.*, held no opinion one way or another) about Ms. Floyd's impairment, the fact that both statements were made in response to requests for accommodation could easily support a reasonable inference that the comments were made with discriminatory intent, and at summary judgment, the Court must draw inferences in Ms. Floyd's favor.  *See Anderson*, 477 U.S. at 255.

[58] To be sure, the "ten years" comments are open to the innocuous interpretation proffered by Rep. Jackson Lee, that they were meant only to ask Ms. Floyd not to spend too much time on lower priority tasks.  *See* Jackson Lee Dep. at 121:7–11 ("We rock and roll in the office, and . . . I'm probably always saying something about getting [work] done, hurry up, don't take too long to get it, and it's because of the nature of the work.").  But at summary judgment, the Court must draw all inferences in Ms. Floyd's favor.  As for causation, the evidence, viewed in Ms. Floyd's favor, shows that on each occasion, Rep. Jackson Lee spoke with knowledge that Ms. Floyd had a vision impairment.  *See Anderson*, 477 U.S. at 255.

*Leavitt*, 407 F.3d 405, 408, 416–17 (D.C. Cir. 2005) (holding that evidence that plaintiff who

was told three times over the course of two months to "go back to Trinidad" or to "go back to

where [she] came from" could not sustain Title VII hostile work environment claim); *cf. Ayissi-*

*Etoh v. Fannie Mae*, 712 F.3d 572, 580–81 (D.C. Cir. 2013) (Kavanaugh, J., concurring)

(explaining that single use of n-word was "sufficiently severe to justify a finding of a hostile

work environment," given that "[n]o other word in the English language so powerfully or

instantly calls to mind our country's long and brutal struggle to overcome racism and

discrimination against African–Americans").

In sum, considering the "totality of the circumstances," a reasonable jury could not

conclude that the verbal harassment to which Ms. Floyd was subjected amounted to an

objectively hostile work environment.  Accordingly, the Court grants Rep. Jackson Lee's motion

for summary judgment on Ms. Floyd's hostile work environment claim.

### D.  Retaliatory Hostile Work Environment

The amended complaint alleges that the hostile work environment suffered by Ms. Floyd

constituted unlawful retaliation for her request for a reasonable accommodation.  *See* Am.

Compl. 19–21.

The ADA, as incorporated by the Congressional Accountability Act, makes it unlawful to

retaliate against an individual for undertaking activity protected by that statute, 2 U.S.C.

§ 1317(a),[59] and, as this Court previously held, such protected activity includes requests for a

reasonable accommodation, *see Floyd*, 968 F. Supp. 2d at 333.  To establish a prima facie case

for a retaliatory hostile work environment claim, a plaintiff must proffer evidence that (1) she

---

[59] The Congressional Accountability Act makes it unlawful to retaliate against a covered
employee because she "has opposed any practice made unlawful by this chapter, or because the
covered employee has initiated proceedings, made a charge, or testified, assisted, or participated
in any manner in a hearing or other proceeding under this chapter."  2 U.S.C. § 1317(a).

engaged in statutorily protected activity; (2) she suffered a hostile work environment; and (3) a

causal link connects the two.  *See Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006)

(explaining that both retaliatory discrete acts and retaliatory hostile work environment are

actionable under Title VII); *Smith v. District of Columbia*, 430 F.3d 450, 454–55 (D.C. Cir.

2005) (articulating prima facie elements for ADA retaliation claim); *Floyd*, 968 F. Supp. 2d at

333–34.[60]

Rep. Jackson Lee is entitled to judgment as a matter of law on Ms. Floyd's retaliatory

hostile work environment claim.  In order for Ms. Floyd to prevail on this claim, a jury must find

that she suffered a hostile work environment.  *See Floyd*, 968 F. Supp. 2d at 333–34; *see also*

Def.'s Mem. Supp. Mot. Summ. J. 32–33.  But as explained above, such a finding cannot be

supported by the summary judgment record.  *See supra* Part IV.C.  Accordingly, the Court grants

the motion for summary judgment as to Ms. Floyd's retaliatory hostile work environment

claim.[61]

### E.  Constructive Discharge

Ms. Floyd alleges that her employer's refusal to provide a reasonable accommodation

resulted in her constructive discharge.  *See* Am. Compl. 16, 17, 18, 21–22.  In her motion for

summary judgment, Rep. Jackson Lee contends that, even under the *arguendo* assumption that

the evidence could establish a failure to accommodate, there is no evidence that could support

the additional "aggravating factors" required to sustain a constructive discharge claim.  *See*

Def.'s Mem. Supp. Mot. Summ. J. 33–36.  The Court agrees that Ms. Floyd's constructive

---

[60] Previously, this Court dismissed Ms. Floyd's other retaliation claim, based on discrete-act materially adverse actions.  *See Floyd*, 968 F. Supp. 2d at 334.

[61] In the alternative, Rep. Jackson Lee submits that Ms. Floyd proffers no evidence of a causal link between her accommodation requests and the alleged hostile work environment.  *See* Def.'s Mem. Supp. Mot. Summ. J. 33.  The Court declines to address this issue.

discharge claim cannot survive summary judgment, but on a basis partially distinct from that advocated by Rep. Jackson Lee.

At the outset, because Ms. Floyd has altogether failed to address her constructive discharge claim in her opposition, she has conceded the issue and abandoned her claim.  *See Hopkins*, 284 F. Supp. 2d at 25.  Nonetheless, the Court briefly explains why, even if she had responded, her constructive discharge claim could not survive summary judgment.

The Court discerns two distinct approaches in the constructive discharge jurisprudence governing courts in this Circuit.  The Supreme Court has taught that a plaintiff asserting a constructive discharge claim must, in addition to proving that she suffered discrimination, "show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."  *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004); *accord Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008).  "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  *Suders*, 542 U.S. at 141.  In applying *Suders*, the D.C. Circuit has explained that constructive discharge "requires a finding of discrimination *and* the existence of certain 'aggravating factors.'"  *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006) (citation omitted).[62]  "'Aggravating factors' are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job."  *Id.*  Such aggravating factors can include "historic discrimination" over a period of several years, "repeated but futile attempts" to remedy the discrimination, and

---

[62] Some commentators have noted that the Supreme Court's decision in *Suders* might call into doubt the viability of earlier "aggravating factors" case law.  1 Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 21-48–21-49 (5th ed. 2012).  Not so in this Circuit, where the court of appeals has expressly incorporated its earlier "aggravating factors" line of decisions into the *Suders* framework.  *See Veitch*, 471 F.3d at 130.

"humiliation and loss of prestige" precipitated by the failure to obtain redress.  *Clark v. Marsh*, 665 F.2d 1168, 1175–76 (D.C. Cir. 1981).  By contrast, conditions not "severe or pervasive" enough to constitute a hostile work environment by the same token cannot constitute aggravating factors supporting a finding of constructive discharge.  *See Veitch*, 471 F.3d at 131 (explaining insufficiency of nonselection for promotion, unfavorable assignments, and criticism).  In short, "the standards for hostile work environment and constructive discharge are not coextensive"; the latter requires more.  *Steele*, 535 F.3d at 694.

In a contrasting line of cases, the D.C. Circuit has held both before and after *Suders* that constructive discharge requires a showing that the employer *intentionally* drove the employee to quit.  In *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549 (D.C. Cir. 1997), the court held that "a finding of constructive discharge depends on whether the employer *deliberately* made working conditions intolerable and drove the employee out."  *Id.* at 1558 (quotation marks omitted) (emphasis added).  Recently, in *Ward*, the D.C. Circuit cited with approval both *Mungin*'s holding and a Fourth Circuit decision holding that a failure to accommodate could not constitute constructive discharge without "evidence that the employer *intentionally sought* to drive [the employee] from her position."  *Ward*, 762 F.3d at 35 (quoting *Johnson v. Shalala*, 991 F.2d 126, 131–32 (4th Cir. 1993)) (emphasis added); *see also Suders*, 542 U.S. at 152–54 (Thomas, J., dissenting) (critiquing majority's "hostile work environment plus" approach and preferring test requiring proof that the "employer subjected [the employee] to an adverse employment action with the *specific intent* of forcing the employee to quit" (emphasis added)); 1 Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 21-38 & n.91 (5th ed. 2012) (reviewing, and contrasting with *Suders*, appeals court decisions requiring showing of specific intent).

The Court need not reconcile this tension, however, because under either approach, there is no dispute of material fact that would enable Ms. Floyd's constructive discharge claim to survive summary judgment.  First, there is not enough evidence that "the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Suders*, 542 U.S. at 134.  To prevail on a constructive discharge claim, the plaintiff must make a "further showing" of objectively intolerable circumstances that go "beyond" a hostile work environment. *Id.*; *accord Steele*, 535 F.3d at 695.  But the Court has already concluded that the evidence could not support a finding either of a hostile work environment, *see supra* Part IV.C, or of a failure to accommodate, *see supra* Part IV.B.4.  Logically, then, this same evidence cannot satisfy the even more demanding requirement that conditions were "so intolerable that a reasonable person in [her] position would have felt compelled to resign[.]"  *Suders*, 542 U.S. at 141.[63]

Nor is there evidence that Rep. Jackson Lee or the Chiefs of Staff "deliberately made working conditions intolerable and drove [Ms. Floyd] out." *Ward*, 762 F.3d at 35–36 (quoting *Mungin*, 116 F.3d at 1558); *see also Floyd*, 968 F. Supp. 2d at 330 (requiring evidence that office "deliberately denie[d] an accommodation knowing that the denial w[ould] make working conditions so intolerable that [Ms. Floyd] w[ould] be forced to resign").  Even if, according to Ms. Floyd's testimony, Rep. Jackson Lee and her Chiefs of Staff had been fully aware of Ms.

---

[63] Rep. Jackson Lee further contends that a constructive discharge claim is foreclosed by evidence that Ms. Floyd, after deciding on August 6, 2010, to resign, remained employed for over a month.  *See* Def.'s Mem. Supp. Mot. Summ. J. 35–36.  The Court disagrees.  To be sure, Ms. Floyd's remaining on the job provides some probative evidence that, under the "objective" inquiry of *Suders*, a reasonable person could not have found working conditions to be "intolerable." *Suders*, 542 U.S. at 141.  On the other hand, the evidence that, when she resigned, Ms. Floyd had not yet arranged another job cuts in her favor.  *See* Floyd Dep. at 187:22–25 (discussing interest in negotiating severance because "it would take . . . some time to get a job").  In short, the factual circumstances surrounding her resignation are disputed, though, as explained above, this dispute is not "material" for summary judgment purposes. *Anderson*, 477 U.S. at 248.

Floyd's monocular vision, there is no evidence that they had specific knowledge of the *severity* of Ms. Floyd's impairment or that certain harsh words would force her to resign.  To the contrary, the parties do not dispute the fact that when she did resign, Rep. Jackson Lee and Mr. Tsehai tried to persuade her to stay; this evidence runs counter to any intent to force her departure.  *See* Floyd Dep. at 213:16–215:15.

Because the evidence cannot support a finding either that Ms. Floyd's working conditions were "so intolerable that a reasonable person in [her] position would have felt compelled to resign," *Suders*, 542 U.S. at 141, or that her employer "intentionally sought to drive [her] from her position," *Ward*, 762 F.3d at 35, the Court grants Rep. Jackson Lee's motion for summary judgment on Ms. Floyd's constructive discharge claim.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss and to revoke Plaintiff's *in forma pauperis* status (ECF No. 49) is **DENIED**, and Defendant's motion for summary judgment (ECF No. 53) is **GRANTED**.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 31, 2015                                    RUDOLPH CONTRERAS
                                                         United States District Judge